In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2254

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH CLARK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09 CR 10067—**Joe Billy McDade**, *Judge*.

ARGUED APRIL 14, 2011—DECIDED SEPTEMBER 15, 2011

Before EASTERBROOK, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. Kenneth Clark was convicted after a jury trial of possessing crack cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). On appeal he argues that evidence related to the drugs found in his truck should have been suppressed and that he should have been permitted more latitude in cross-examining the government informant who exposed him as her sup-

plier. But the police had probable cause when they searched Clark's truck and found the drugs after he pulled into the informant's driveway to make a scheduled delivery. And because Clark had ample opportunity to expose the informant's motives and biases on the stand, the district court did not abuse its discretion by forbidding him to inquire into salacious details about her personal life. We affirm the district court's judgment.

**I.**

Things fell apart for Clark when one of his customers turned on him. Mary McCormick was a dealer who had been buying crack and powder cocaine from Clark for about five months before she was arrested by police in Peoria, Illinois; a search of her house turned up almost 25 grams of crack, as well as scales, plastic baggies, and $1,400 in cash. The police offered to be lenient with McCormick if she would help them snare her supplier, and she quickly agreed. She said his name was Kenneth (she could not remember his last name) and described him as a black man with short hair who was in his 40s, stood about 5 feet 9 inches, and weighed around 260 pounds. He would drive down from Chicago to make deliveries a few times each month, she explained, always in the same red pickup truck. His route was consistent too: He would arrive in Peoria on westbound Interstate 74, exit at Knoxville Avenue, drive north about four miles, turn west on Northmoor Road, and then make a quick right to arrive at McCormick's house on Jayar Drive.

In fact, McCormick told the police, she was expecting her supplier to make a delivery that very week. As officers listened in, McCormick phoned Clark to arrange the details. Clark agreed to drive down to Peoria two days later with 10 ounces of cocaine. Sometime during this interlude McCormick learned Clark's last name and passed that information on to the officers. She also guessed that the red truck he was driving might be a Dodge Ram.

On the day of the delivery, McCormick kept in close contact with the police. In the early afternoon she called to say that she had just spoken with Clark. He had left Chicago and was traveling southbound on Interstate 55, she reported, in the same red pickup truck that he always drove. And he had confirmed that he planned to take his usual approach into Peoria. At 3:00 p.m. she phoned the police again to relay that Clark had just exited Interstate 55 and now was headed west on Interstate 74. About this same time, an officer who was stationed where the two highways meet, a little over 30 miles east of Peoria, caught a glimpse of a red pickup truck on westbound Interstate 74. With Clark's journey unfolding exactly as expected, the police back in Peoria started to prepare for his arrival: a canine unit was put on standby, ready to proceed to McCormick's house as soon as Clark showed up with the cocaine. Then, around 4:00 p.m., McCormick called the police a final time to tell them that Clark had made it to Peoria. He was running an errand at a Walgreens on Knoxville Avenue, she explained, but would be at her house shortly. Minutes later, an officer conducting surveillance at the

intersection of Knoxville Avenue and Northmoor Road spotted a red pickup truck turn west in the direction of Jayar Drive. Additional officers were lying in wait at McCormick's house; within a few seconds they saw a red Ford pickup pull into McCormick's driveway, driven by a man who matched her description of her supplier.

The police approached the truck with guns drawn. After the driver identified himself as Kenneth Clark, the officers ordered him to step out of his vehicle. They conducted a quick pat-down search, put him in handcuffs, and placed him in the back seat of a squad car. Meanwhile, the canine unit had been summoned to the scene. No one seems to have a firm grasp on how long it took for the drug-sniffing dog to arrive; estimates range from 15 to 30 minutes. In any event, there is no suggestion that the police dallied. And once the canine unit got to McCormick's house, the pace quickened. On its first lap round the truck, the dog alerted at the driver's door; then, when officers let the dog inside the vehicle, the canine alerted again at the dashboard near the steering column. The police removed the dashboard panel to discover, squirreled away inside, a plastic bag containing 10 ounces of cocaine, just as Clark had promised. About 4 ounces of the total was crack.

After Clark was charged with violating section 841(a), he moved to suppress the cocaine found in his truck. The only argument he made in his written submission was that, when he arrived at McCormick's house, the Peoria police did not have probable cause either to detain him or to search his truck. The district court

ruled otherwise, however, and at trial the drugs were, to no one's surprise, the centerpiece of the government's case.

But the government also presented testimony from McCormick, who told the jury about her history with Clark and how she had helped the police reel him in. Before trial, the district court had denied Clark's request to impeach McCormick with questions about her tumultuous history with a Carolyn Parker. Apparently the two had been lovers. But the relationship turned sour, to the point where Parker had obtained an order of protection from a state court. And as the parties buckled down to prepare for trial, McCormick was arrested for violating that order of protection; allegedly she had been placing salacious notes, accompanied by sex toys, on Parker's car. Clark's lawyer wanted to bring all this to the jury's attention. He proffered that one of the notes, which he had obtained from the police, included a frank discussion of the pair's predilection for using cocaine during sex, an admission, the lawyer insisted, that contradicted McCormick's grand-jury testimony that she did not use drugs at all. Plus, the lawyer urged, the arrest would call into question whether McCormick had breached her cooperation agreement with the government. And, finally, the lawyer offered that McCormick allegedly had told one of her friends that, if Parker had her arrested for violating the order of protection, she was going to lie to the police so that Parker would get hauled off to jail too. "What I'm interested in bringing out," the lawyer promised the district court, "has nothing specifically to do with

[McCormick's] sexual preferences or . . . the facts of the allegations."

To the government, though, this was all just a blatant attempt to inflame the jury. The district court likewise thought that information concerning McCormick's trouble with Parker would be irrelevant and "extremely prejudicial" and, accordingly, refused to let Clark ask any questions about the discord between the two. Nevertheless, the court did permit Clark's lawyer to question McCormick about her drug use and the terms of her deal with the government. And, indeed, during cross-examination the lawyer extracted an acknowledgment from McCormick that she was cooperating with the government only because she had been offered a term of probation for committing a drug offense that would otherwise expose her to as much as 30 years' imprisonment and that she had failed to tell her government handlers all that she knew about the Peoria drug scene, even though her cooperation agreement required her to be completely forthcoming. McCormick also conceded that, notwithstanding her grand-jury testimony, she and Parker had used cocaine during sex.

## II.

Clark has hired a new lawyer to represent him on appeal and renews his argument that the drugs found in his pickup ought to have been suppressed. He insists that McCormick's information did not give the Peoria police probable cause to believe he was delivering drugs when he pulled his truck into her driveway. In

his view, then, the police lacked the requisite legal basis on which to arrest him[1] or to search the interior of his truck. The gist of his argument is that McCormick could not have been considered a reliable source because she had never before worked with the police and in fact had some details wrong. For example, she said that he would be driving a red Dodge truck, although actually he drove a red Ford truck, plus she said that he weighed about 260 pounds, when really he weighed only 200 pounds. And what is more, he continues, the police did not bother to corroborate some important pieces of her account.

Picking holes in McCormick's story and attacking the officers' willingness to take her at her word might get Clark somewhere if McCormick was just an anonymous tipster or a peripheral player. *See Alabama v. White*, 496 U.S. 325, 329 (1990); *United States v. Harris*, 464 F.3d 733, 740 (7th Cir. 2006); *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003); *United States v. Koerth*, 312 F.3d 862, 866-68 (7th Cir. 2002). But McCormick was no ordinary informant; she bought large quantities of drugs directly

---

[1] We shall assume, without deciding, that by approaching Clark with guns drawn, patting him down, and placing him in handcuffs, the police effectuated a de facto arrest rather than a mere investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968). *But see, e.g., United States v. Bullock*, 632 F.3d 1004, 1016-17 (7th Cir. 2011) (holding that handcuffing defendant, placing him in squad car, and transporting him to residence where search was taking place did not transform investigative detention into arrest).

from Clark on multiple occasions. Specific information from a person who has turned on her partner in crime and told the police about their malfeasance (thus implicating herself as well as her partner) goes a long way toward establishing probable cause. *United States v. Harris*, 403 U.S. 573, 583 (1971); *United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004); *United States v. Brown*, 366 F.3d 456, 459 (7th Cir. 2004); *United States v. Rosario*, 234 F.3d 347, 351 (7th Cir. 2000). In fact, some of our sister circuits have held that even an *uncorroborated* account is sufficient to establish probable cause under these circumstances. *See United States v. Patterson*, 150 F.3d 382, 386 (4th Cir. 1998); *Craig v. Singletary*, 127 F.3d 1030, 1045-46 (11th Cir. 1997) (en banc); *United States v. Chin*, 981 F.2d 1275, 1278 (D.C. Cir. 1992) (R. Bader Ginsburg, J.); *United States v. Gaviria*, 805 F.2d 1108, 1115 (2d Cir. 1986).

We need not dwell on this possibility, however, because the Peoria police *did* corroborate the most significant detail of McCormick's story. They listened in on her phone call with Clark and heard her place an order for a significant amount of cocaine to be delivered to her home by Clark himself in two days' time; two days later, Clark showed up on her doorstep just as he had promised. When Clark pulled his pickup into McCormick's driveway, the police had probable cause to believe that he was fulfilling his end of that bargain; in other words, they had probable cause to believe that he was dropping off the order of cocaine. *See Illinois v. Gates*, 462 U.S. 213, 244-45 (1983); *United States v. Cruz-Rea*, 626 F.3d 929, 939-40 (7th Cir. 2010); *United*

*States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005); *United States v. Oliva*, 385 F.3d 1111, 1114-15 (7th Cir. 2004); *United States v. Walker*, 237 F.3d 845, 850 (7th Cir. 2001); *United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999); *United States v. Navarro*, 90 F.3d 1245, 1253-54 (7th Cir. 1996). We do not agree with, and are given no support for, Clark's contention that probable cause evaporated simply because McCormick's story contained two negligible errors. The fact that McCormick mistook the brand of Clark's red pickup truck is immaterial given her otherwise impeccable sketch of the vehicle; likewise, the fact that she added pounds to his frame is a minor and, under the circumstances, an understandable inaccuracy that does not come close to poisoning a description that was in all other respects spot-on.

Clark makes additional arguments about the search of his truck. His contentions about the drug-sniffing dog are irrelevant, however, in light of our conclusion that even before the dog was summoned McCormick's information already had given police probable cause to believe that Clark was transporting cocaine in the vehicle. The police thus had a sufficient basis on which to search his truck without a warrant. *United States v. Ross*, 456 U.S. 798, 809 (1982); *see also Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 1719, 1723-24 (2009) (search of automobile incident to arrest). As for Clark's insistence that police were not permitted to take apart his dashboard during this search, this argument is waived because Clark never presented it to the district court and even now does not suggest that he possessed "good cause" to excuse his failure to present the conten-

tion before the deadline for filing pretrial motions. FED. R. CRIM. P. 12(e); *United States v. Figueroa*, 622 F.3d 739, 742 (7th Cir. 2010); *United States v. Acox*, 595 F.3d 729, 731-32 (7th Cir. 2010); *United States v. Kirkland*, 567 F.3d 316, 320 (7th Cir. 2009). And no wonder; the argument goes nowhere. If the police have probable cause to search a vehicle for drugs, they may look anywhere drugs could be stashed. *Ross*, 456 U.S. at 820-21; *United States v. Goncalves*, 642 F.3d 245, 249-50 (1st Cir. 2011); *United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008); *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007). They may also allow a dog into the vehicle to sniff for the presence of narcotics. *United States v. Sukiz-Grado*, 22 F.3d 1006, 1009 (10th Cir. 1994). Here, once the dog entered the truck and alerted to the dashboard, the police had ample grounds to remove the dashboard as part of their search. *See, e.g.*, *United States v. Vasquez*, 635 F.3d 889, 894 (7th Cir. 2011) (positive dog alerts to passenger side of dashboard supported search which discovered hidden compartment in that area of dashboard), *petition for cert. filed*, 80 U.S.L.W. 3098 (U.S. Aug. 8, 2011) (No. 11-199); *United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995) (positive dog alert to wall of recreational vehicle supported removal of wall panel, behind which cocaine was discovered).

We turn next to the question of whether the district court erred by limiting Clark's cross-examination of McCormick at trial. McCormick was the government's "key" witness, Clark points out, and her testimony was mostly uncorroborated. Thus, he insists, he should have been permitted to ask her questions about her recent arrest for violating the order of protection that Parker,

her ex-girlfriend, had obtained against her. He needed to explore this arrest before the jury, Clark says, because the incident would have impeached McCormick's credibility and exposed her motive to lie on the stand. In particular, Clark insists that he should have been permitted to ask McCormick whether the government was willing to give her a break when she was arrested for violating the order of protection—and what she might have offered the government in exchange for that leniency. He also contends that he should have been permitted to ask McCormick whether she had threatened to lie to the police to get Parker in trouble, which he says would have revealed to the jury that McCormick had no qualms about leveling false accusations against an innocent person.

As an initial matter, we disagree that McCormick's testimony was as indispensable to the government's case against Clark as he makes it out to be. What doomed Clark was the 10 ounces of cocaine found inside his truck, not McCormick's testimony about how and why the drugs got there. It is hard to imagine any jury acquitting Clark of possession with intent to distribute no matter how many peripheral lies McCormick might have told. The bottom line is that she called Clark, with police listening in, and asked him to deliver 10 ounces of cocaine, and he did exactly that. What else did the jury need to know?

In any event, we do not believe that Clark's constitutional rights were violated by the district court's limitation on cross-examination. It is true that the opportunity to impeach a witness's credibility and expose her

motive to lie is at the core of the right guaranteed to criminal defendants by the Sixth Amendment's Confrontation Clause. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *United States v. Mokol*, 646 F.3d 479, 485 (7th Cir. 2011); *United States v. Beck*, 625 F.3d 410, 417 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 2923 (2011); *United States v. Martin*, 618 F.3d 705, 727-28 (7th Cir. 2010). But the Confrontation Clause does not give a defendant a boundless right to impugn the credibility of a witness; the district court still enjoys "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). If the defendant already has had a chance to impeach the witness's credibility and establish that she has a motive to lie, then any constitutional concerns vanish and we review the district court's decision to limit additional inquiries only for abuse of discretion. FED. R. EVID. 608(b); *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009); *United States v. Smith*, 308 F.3d 726, 738 (7th Cir. 2002); *United States v. Saunders*, 166 F.3d 907, 918-19 (7th Cir. 1999).

Because the jury in this case heard plenty about McCormick's motives and biases, more than enough to make a critical assessment of her credibility, we conclude that the district court did not abuse its discretion by forbidding Clark's lawyer to bring up McCormick's recent tiff with Parker. *See Kentucky v. Stincer*, 482 U.S. 730, 739 (1987); *United States v. Linzy*, 604 F.3d 319, 323-24 (7th Cir. 2010); *United States v. McLee*, 436 F.3d 751, 761-62

(7th Cir. 2006); *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994). This line of questioning was highly inflammatory yet only barely relevant. Clark insists that pressing McCormick about this incident was necessary to expose not only her motive to embellish her accusations against Clark in exchange for leniency but also her penchant for lying to the police when it suited her interest. But Clark's lawyer ably alerted the jury to both of those concerns. Indeed, the lawyer aggressively challenged McCormick on the witness stand, peppering her with questions about her lengthy criminal history and the generous deal she had made with the government in exchange for her testimony. The lawyer got McCormick to concede that she had not been entirely honest with the government, notwithstanding the fact that her cooperation agreement required her to divulge all she knew about the Peoria drug scene. What is more, the lawyer even had the opportunity to quiz McCormick about her sexual escapades with her ex-girlfriend and to juxtapose Parker's "topical" use of cocaine during their romantic encounters with McCormick's grand-jury testimony that she never had used illegal drugs. In short, Clark's lawyer got his point across. To permit him to hammer home that point by asking whether McCormick had violated an order of protection when she left intimate letters and sex toys on Parker's windshield not only would have been redundant but, worse, would have reduced the proceedings to a sideshow. The Constitution does not require courts to allow this sort of meaningless spectacle.

## III.

We have said all there is to say about the merits of Clark's appeal, but one glaring issue remains to be addressed: the conduct of Clark's appellate lawyer, Michael Finn. At the last minute he refused to show up for oral argument and, despite numerous opportunities, has failed to offer *any* explanation—or even drop a hint— as to why he abandoned Clark at that critical moment. *See In re Riggs*, 240 F.3d 668, 671 (7th Cir. 2001) ("Abandonment of one's (imprisoned) client in a criminal case is one of the most serious offenses a lawyer can commit . . . ."); *United States v. Adeniji*, 179 F.3d 1028, 1029-30 (7th Cir. 1999); *In re Mix*, 901 F.2d 1431, 1432 (7th Cir. 1990). On the morning he was scheduled to argue this appeal, Finn telephoned our Clerk's Office and announced that he would not be appearing in court after all. And that is *all* he said. We told the Clerk's Office to instruct Finn that his presence was required, but Finn neglected to answer his phone and declined to return voice messages left by court staff. We then issued a written order directing Finn to show cause why he should not be disciplined for skipping oral argument, and *still* he failed to explain himself. In fact, in his response he concedes that he was capable of participating in oral argument and that he "should have" done so. (It is worth noting too that Finn's office is cater-corner from the courthouse in downtown Chicago; only a couple hundred feet separate his door from our door.) Nevertheless, Finn has proposed that, in lieu of punishment, we ought to allot him a chance to "correct" his

bad behavior, although he has left it to us to figure out just how the damage could be undone.

Missing oral argument, however, was not Finn's only misstep. In our order to show cause, we also directed him to explain his noncompliance with Circuit Rule 30(a), which commands lawyers to submit, in an appendix accompanying the main brief, a copy of "the judgment or order under review and any opinion, memorandum of decision, findings of fact and conclusions of law, or oral statement of reasons delivered by the trial court or administrative agency upon the rendering of that judgment, decree, or order." The appendix Finn submitted lacked a transcript of the district court's ruling on his client's motion to suppress; all that Finn included was a copy of the docket sheet. "We cannot imagine counsel might believe that we could review a denial of a motion to suppress without having an inkling of the district court's findings of fact or conclusions of law." *United States v. Stribling*, 94 F.3d 321, 325 (7th Cir. 1996). Worse still, Finn had falsely certified that he *did* abide by Rule 30's requirements. *See United States v. Patridge*, 507 F.3d 1092, 1096 (7th Cir. 2007) ("This court regularly fines lawyers who violate Circuit Rule 30 yet falsely certify compliance . . . ."); *United States v. Rogers*, 270 F.3d 1076, 1084-85 (7th Cir. 2001); *In re Galvan*, 92 F.3d 582, 584-85 (7th Cir. 1996). The rule is unambiguous, and Finn does not contend otherwise. He chalks up his noncompliance to his limited experience practicing before this court, but his unfamiliarity with our rules is all the more reason why he should have given them careful study before preparing his main brief. Nothing

suggests that Finn did; surely no one who had read the rule could have thought that a docket sheet was sufficient.

We conclude that Finn has acted unprofessionally and that a public censure is in order. *See Redwood v. Dobson*, 476 F.3d 462, 470 (7th Cir. 2007) (citing *In re Charges of Judicial Misconduct*, 404 F.3d 688, 695-96 & n.3 (2d Cir. 2005)) (explaining that censure is a more "opprobrious" sanction than a reprimand or an admonishment). We also fine Finn $1000, payable to the Clerk within 14 days. To leave a client unrepresented on the morning of oral argument is nothing short of appalling; that Finn seems to have tossed Clark to the wind just because he did not feel like showing up in court is simply astonishing. And Finn's thoughtless approach to preparing his main brief likewise is inexcusable. Other clients, present or potential, ought to be aware. And because we have no desire to inflict upon anyone a lawyer with such a cavalier approach to the duties owed his clients, we will refrain for 24 months from appointing Finn to any appeals under the Criminal Justice Act. At that point, Finn may apply to be reinstated to the roll of eligible lawyers. Finally, we direct the clerk of this court to send a copy of this opinion to the Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois to determine whether additional sanctions are appropriate.

The judgment is affirmed, sanctions are imposed, and directions are issued.