In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-3425

PEDRO RAMOS,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 1058—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 20, 2011—DECIDED MAY 24, 2013

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Pedro Ramos was arrested in 2007 and charged with residential burglary in violation of 720 ILCS 5/19-3. After a bench trial, he was acquitted of that charge, and he subsequently brought an action pursuant to 42 U.S.C. § 1983, alleging that the defendants, the City of Chicago and five of its police officers, violated his constitutional rights under the Fourth and Fourteenth Amendments in conducting a

false arrest and malicious prosecution, and also asserting state law claims for malicious prosecution and indemnification. The district court granted summary judgment in favor of the defendants on the § 1983 claims and declined to exercise supplemental jurisdiction over Ramos' state law claims. Ramos appeals the summary judgment as to his § 1983 claims.

On appeal from a grant of summary judgment, we review the decision of the district court *de novo*. *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012). Examining the evidence in the light most favorable to Ramos, and construing all inferences in his favor, we will affirm summary judgment only if there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law. *Id.* Our narrative that follows is limited to the facts upon which there is no dispute, as set forth in the parties' Rule 56.1 Statement, and additional facts submitted to the district court by Ramos.

On September 27, 2007, Jose Garcia went to check on a house that he co-owned with his brother who was on vacation. When he arrived at the backyard of the home, Garcia noticed that the back gate was uncharacteristically open, and the storm door to the home was ajar. As Garcia walked toward the house, he noticed that two men stood inside the open doorway. Upon seeing Garcia, the men ran deeper into the interior of the home and then fled from it. One of the intruders, Miguel Manzano, drove a station wagon from the home, and Garcia gave chase in his own vehicle. While

tracking Manzano, Garcia, who was an off-duty Chicago police detective, called 9-1-1 and requested police backup. Detective Michael Pagan responded to that call and assisted Garcia in apprehending Manzano. Pagan subsequently transmitted information over police radio concerning the existence of the second intruder and the address of the burglary. Defendant Officers John Stanley and Timothy Shanahan joined by two others who were eventually dismissed from the case, Jim Johnson and Cesar Claudio, then proceeded to that address, at which time they received updated information from Officer Brian Reidy via radio, indicating that the second suspect: "[s]upposedly lives at 7249 South Lawndale, first name Jose" and that he was a male, Hispanic, and in his 20s. The radio dispatch also indicated that the suspect had a red shirt on but had taken it off and probably had a white tank shirt on, and that he was about 5'2" and bald. One officer inquired over the radio about the suspect "Peso," but the dispatcher corrected the officer and informed him that the name of the suspect was "Jose." In addition, the officers received transmissions indicating that the second suspect was a member of the "Saints" street gang, and that he was believed to have guns in his house.

Based on those radio transmission, the officers proceeded to the South Lawndale address. As they approached the front entrance of that residence, they noticed Ramos, a Hispanic male in a red shirt, who appeared as though he could be in his twenties, pulling away from the curb in front of the residence in a Chevy Equinox. Officer Stanley motioned for the vehicle

to stop, and asked Ramos for his driver's license. Ramos did not possess a valid driver's license, and he produced only his state identification to Stanley. Stanley then asked Ramos to exit the vehicle, handcuffed him, and explained that they were investigating a burglary. The officers placed Ramos in the back of the police car until they could bring Garcia to the scene from his location a few blocks away. Garcia identified Ramos as the other person he observed inside the burglarized home, at which point Stanley, Johnson, Claudio, and Shanahan placed Ramos under arrest. Evidence presented to the district court indicated that Ramos was actually 33 years of age (although Ramos acknowledged in the undisputed facts that he appeared as though he could be in his 20s), stood 6'1" tall, and weighed 320 pounds. There was some evidence that Garcia had described the second intruder as larger than 5'7", but taking the evidence in the light most favorable to Ramos, we assume that the description the officers had was of a person who stood 5'2" in height.

Ramos had previously been arrested for a weapons violation and charged with six counts of aggravated unlawful use of a weapon, in violation of 720 ILCS 5/24-1.6(A)(1),(2), and one count of unlawful use of a weapon by a felon, in violation of 720 ILCS 5/24-1.1. He had posted bond on August 3, 2007 on the weapons charges, but that bond was revoked when he was charged with residential burglary. Accordingly, Ramos remained incarcerated from the time of his arrest until his acquittal on the residential burglary charge on June 5, 2008, at which time his bond was reinstated.

On August 12, 2008, he pled guilty to one count of unlawful use of a weapon, and was sentenced to 3 years' imprisonment. The 253 days that he served from his residential burglary arrest on September 27, 2007 until the June 5, 2008 acquittal was credited as time served on his weapons conviction.

Ramos then brought this § 1983 action against the defendants, alleging that one or more of the defendants arrested him without a lawful basis, and caused him to be charged and prosecuted unlawfully by including false statements in one or more police reports, in contravention of his Fourth and Fourteenth Amendment protections. Specifically, Ramos contends that his Fourth Amendment rights were violated by his arrest which was not based on probable cause. On appeal, he limits this claim to the time period before Garcia positively identified him as the second intruder. He argues that the defendants violated the Fourth Amendment by stopping his vehicle and then handcuffing him and placing him in the police vehicle while awaiting Garcia. In addition, he asserts a claim of wrongful prosecution, alleging that one or more of the defendants falsely stated that Manzano, the first intruder, had implicated Ramos. He argues on appeal that Officer Shanahan prepared a police report stating that Manzano implicated Ramos in the burglary. Manzano, in his deposition testimony, denied that he had identified Ramos as his partner in the burglary, and stated that he did not know Ramos until he met him in jail awaiting trial in the criminal case.

The district court granted summary judgment to the defendants on both claims. With respect to the claim for false arrest, the court held that the brief detention of Ramos while investigating the situation was not an arrest, but rather was an investigatory stop that, under *Terry v. Ohio*, 392 U.S. 1 (1968), is permissible as long as the officers have reasonable suspicion that criminal activity is ongoing. The court held that the officers were justified in the initial stop of the vehicle because they had reasonable suspicion of criminal activity based on the description and location of the second suspect, and that the knowledge about his gang affiliation and gun ownership justified placing him in handcuffs without converting that investigatory stop into an arrest.

Regarding the claim for wrongful prosecution, the district court held that a constitutional claim for malicious prosecution is not available where a state law remedy exists. *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). Because Illinois recognizes the tort of malicious prosecution, the court held that Ramos could not proceed on a due process challenge in the court on the same grounds. The court further considered whether Ramos could pursue a "*Brady*-type violation" premised upon the officer's fabrication of evidence and failure to reveal that falsification to Ramos. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Parish v. City of Chicago*, 594 F.3d 551 (7th Cir. 2009). The court rejected that claim as well, however, because Ramos had failed to demonstrate any prejudice resulting from the false evidence.

On appeal, Ramos challenges the court's holdings on the merits, but argues as an initial matter that the court should not have considered the possibility that his detention was a valid *Terry* stop because the defendants did not argue that in their motion for summary judgment. A party seeking summary judgment generally must raise arguments in support of that motion in its opening memorandum in order to give the other party a fair opportunity to respond. *Smith v. Bray*, 681 F.3d 888, 902-03 (7th Cir. 2012). Ramos is incorrect, however, in his contention that the *Terry* argument was not adequately asserted. The motion for summary judgment addressed the claim in the complaint, which was that Ramos was arrested without a lawful basis. Accordingly, the arguments in the motion were focused on the actions of the defendants that could be construed as an arrest, which undoubtedly included the clear arrest after Garcia identified Ramos, but also arguably included the actions of the defendants in detaining and handcuffing Ramos. Although the initial stop of the vehicle was not discussed at length, the defendants pointed to the consistency between Ramos' gender, ethnicity, age, clothing, and location with that of the second suspect as providing a proper basis for the initial detention. Ramos was therefore apprised of their position as to the constitutionality of the initial stop. The defendants asserted that the actions of the officers complied with the Fourth Amendment, and nothing in their motion or memorandum indicates an attempt to abandon or ignore the constitutionality of the stop at its outset. When Ramos responded to the

motion by dismissing some defendants and narrowing the scope of his claims to the small window of time between the initial stop of the vehicle and the arrival of Garcia, the defendants responded with a more exhaustive analysis of the initial detention, and the district court properly addressed that argument in determining that the detention was a reasonable *Terry* stop. *See Bernstein v. Bankert*, 702 F.3d 964, 984-85 (7th Cir. 2012).

We turn, then, to the constitutionality of the defendants' actions during that time window. As the district court properly noted, officers are not required to have probable cause to believe that a person is involved in a crime in order to detain him for a brief investigatory stop. Instead, officers are allowed to conduct such an investigatory stop where they simply have reasonable suspicion, based on specific and articulable facts, that a crime is occurring. *United States v. Patton*, 705 F.3d 734, 737 (7th Cir. 2013). That standard is less demanding than probable cause, and requires more than an unparticularized hunch but less than a probability or substantial chance that criminal activity exists. *Id.* at 741. "[S]o long as the suspicion . . . is supported by specific, identifiable facts, it is an objectively reasonable suspicion that satisfies *Terry*." *Id.*, citing *United States v. Thomas*, 512 F.3d 383, 388 (7th Cir. 2008).

The initial stop of the vehicle falls well within the *Terry* reasoning. At the time of the stop, the officers had received information that a second suspect had been involved in a burglary of a home in the area, that the person involved lived at 7249 S. Lawndale, that he was

a Hispanic male, in his 20s, and that he would be wearing either a red shirt or a white tank. After they approached the address of the suspect, they observed a person matching that description pull away from the curb in front of the home. The congruity between Ramos' appearance and the description of the suspect, particularly given that the suspect was pulling away from the curb at the address identified as that of the suspect, provided reasonable suspicion for a *Terry* stop. *See United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011) ("Whether it was reasonable for an officer to suspect that the defendant was engaged in wrongdoing calls for an objective inquiry into all of the circumstances known to the officer at the time he stopped the defendant, including information relayed to him by fellow officers and police dispatchers.") At that point, because Ramos was seated in a car, the discrepancy between the 5'2" height announced over the radio and Ramos' actual 6'1" stature would not have been readily apparent.

Once Ramos was pulled over, however, the basis for reasonable suspicion became much more tenuous. Ramos provided the officers with identification, which indicated that his name was "Pedro." That contradicted the information they had received over the radio that the second suspect was named Jose. Once Ramos exited the vehicle, it also should have been apparent to the officers that he was of a drastically different height than that of the suspect—6'1" instead of 5'2". Accordingly, the officers were left with an identification that matched in broad, and less useful, categories such as ethnicity

and gender, and in somewhat more narrow areas such as the color of the shirt and the location of the suspect. But the officers also knew that some of the most specific information did not match at all, including the name and the height. While the name discrepancy is not dispositive given the potential for false identification cards, the dramatic difference in height cannot be discounted. This is a weak reed upon which to rest reasonable suspicion, let alone the probable cause that may well be required given the decision to handcuff Ramos. For although we have upheld the use of handcuffs to ensure officer safety in a *Terry* stop of brief duration, without automatically escalating the situation to an arrest, that does not mean that law enforcement has carte blanche to handcuff routinely. The proliferation of cases in this court in which "*Terry*" stops involve handcuffs and ever-increasing wait times in police vehicles is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of the stop. *See, e.g., United States v. Bullock*, 632 F.3d 1004, 1015-16 (7th Cir. 2011) (determining whether conduct including handcuffing the suspect transformed a *Terry* stop into a de facto arrest, and noting the subtle distinctions between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest, and a de facto arrest); *United States v. Clark*, 657 F.3d 578, 581 (7th Cir. 2011) (assuming, without deciding, that approaching the defendant with guns drawn, patting him down, and placing him in handcuffs effectuated a de facto arrest rather than investi-

gatory *Terry* stop); *Clark*, 657 F.3d at 581 (characterizing the handcuffing of a suspect as not a normal part of a *Terry* stop but noting that it does not automatically turn a *Terry* stop into an unlawful arrest); *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993) (observing that "in the 'rare' case wherein common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only through the use of handcuffs, 'we will not substitute our judgment for that of the officers as to the best methods to investigate.'").

Nevertheless, we need not determine in this case whether the detention with handcuffs was an arrest requiring probable cause, and whether the description provided such probable cause, because the defendants undoubtedly had probable cause to arrest Ramos once he failed to produce a valid driver's license—or even any driver's license—after being stopped. "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012), citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). Before that point, the defendants had reasonable suspicion to conduct an investigatory stop based on the description, and could request identification pursuant to that stop. We have held that a traffic violation can constitute proba-

ble cause for an arrest, including driving without a license. *United States v. Garcia*, 376 F.3d 648, 649-50 (7th Cir. 2004); *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003). Ramos argues that the defendants were not aware at that time that his license had been suspended, but the failure to present a license was itself an offense. *People v. Moorman*, 859 N.E.2d 1105, 1118 (Ill. App. 2 Dist. 2006). Moreover, we have repeatedly held that the offense for which probable cause exists need not be the subjective offense for which the officer was conducting the arrest. *See Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013); *Fox v. Hayes,* 600 F.3d 819, 837 (7th Cir. 2010); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). It is enough that probable cause exists as to an offense, and here the failure to produce a valid driver's license provided probable cause to arrest Ramos at that time. Accordingly, the district court properly granted summary judgment on the § 1983 claim that the defendants violated his Fourth Amendment rights in his detention and arrest.

Ramos also argues that the district court erred in granting summary judgment to the defendants on his wrongful prosecution claim, but he fails to challenge the claim actually addressed by the district court. In his complaint, Ramos conflated his claims for false arrest and wrongful prosecution, such that it was difficult to discern whether the malicious prosecution claim was brought under the Fourth Amendment as well as the Fourteenth Amendment, or whether the Fourth Amendment was applicable only to his false arrest claim. The district court and the defendants clearly believed

that only Fourteenth Amendment due process claims
were brought as to malicious prosecution, and addressed
the argument and decision accordingly. That reading
was certainly reasonable. In his summary judgment
response as to the malicious prosecution claim, Ramos
begins by declaring that the false statements of the
officer or officers are actionable under the Fourth and
Fourteenth Amendments, but then proceeds to argue
only along Fourteenth Amendment lines. At no point
does Ramos argue that a Fourth Amendment claim sur-
vives even if his Fourteenth Amendment claim fails.
Nor does Ramos identify any seizure that would form
the basis of a Fourth Amendment claim of malicious
prosecution. The theory behind such a Fourth Amend-
ment claim is that officers who misrepresent evidence
to prosecutors may be held accountable for the seizure
based on that misinformation. In other words, the theory
is that if a person is in jail awaiting trial on charges
that were approved by a prosecutor based, unknowingly,
on false information from the officers, and his seizure
would lack probable cause without that false evidence,
that person could pursue an action against the officers.
Under that theory, the constitutional deficiency is at-
tributable to the officers, not the prosecutor, because the
determination by the prosecutor was not an independent
one, but rather was manipulated by the officers who
supplied the fabricated evidence. *See, e.g., Parish v. City of
Chicago,* 594 F.3d 551, 554 (7th Cir. 2009); *Tully v. Barada,*
599 F.3d 591, 595 (7th Cir. 2010); *Johnson v. Saville,* 575
F.3d 656, 663 (7th Cir. 2009). We need not determine the
contours of such a claim, however, in this court because

Ramos failed to make any arguments below that his seizure (his detention for 253 days pending his acquittal) was attributable to the allegedly false statements by the officers. In fact, Ramos concedes that, although his bond was revoked because of the arrest for residential burglary, his detention was for the unlawful use of a weapon charges. All of the time served was credited to the weapons charge to which he pled guilty, and therefore was a part of his incarceration on that conviction. It is not a seizure related to this case at all.

In fact, Ramos relies on that jail time, and an alleged loss of employment, as his sole basis for damages under the malicious prosecution claim, but it fails for the same reason. The jail time was attributable entirely to the weapons charge and conviction, and therefore cannot form the basis for damages for his residential burglary claim because he would have served that time regardless of the burglary charge. The only other basis for damages alleged is the claim that, as a result of the defendants' wrongful acts, he lost his job, but Ramos later admitted that "[a]s of the day of his arrest, September 27, 2007, Ramos had been unemployed for four months." Plaintiff's Response to Defendant's Rule 56.1 Statement #40. Even though both the defendants and the district court repeatedly raised the problem of the lack of any damages, Ramos provided no other argument for damages until the reply brief in this court, which is far too late. *United States v. Vallone*, 698 F.3d 416, 448 (7th Cir. 2012). The single sentence Ramos articulated about damages in the summary judgment briefing before the district court was that "under long standing

Illinois law, damages are presumed when the prosecution results in incarceration. *Schattgen v. Holnback,* 149 Ill. 646 (1894)." Whether or not this precedent from 1894 still holds, any presumption of damages is surely defeated in a case where all of the time served is ultimately credited toward an unrelated weapons violation. And even if this brief sentence constituted an argument raised below (and we doubt that this perfunctory argument could be, *see United States v. Wescott*, 576 F.3d 347, 356 (7th Cir. 2009)), Ramos failed to raise the issue of damages before this court and therefore waived the argument on appeal. The district court properly granted summary judgment to the defendants on the malicious prosecution claims under § 1983.

Accordingly, the decision of the district court is AFFIRMED.