NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 7, 2014[*]
Decided May 12, 2014

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 13-2294

| | |
|---|---|
| ZAFAR SHEIKH,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>DAVID RABIN, et al.,<br>    *Defendants-Appellees.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 11 C 425<br><br>Robert M. Dow, Jr.,<br>*Judge.* |

No. 13-3552

| | |
|---|---|
| ZAFAR SHEIKH,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>MARC LICHTMAN, et al.,<br>    *Defendants-Appellees.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 11 C 2334<br><br>Samuel Der-Yeghiayan,<br>*Judge.* |

---

[*] After examining the briefs and records, we have concluded that oral argument is unnecessary. Thus, these appeals are submitted on the briefs and records. *See* FED. R. APP. P. 34(a)(2)(C).

**O R D E R**

Zafar Sheikh, who is Muslim and originally from South Asia, wants to build a sizable home on vacant land purchased from Lake County, Illinois, in the City of Highland Park. The city has declined to grant zoning variances that Sheikh needs for his proposed residence, and he suspects that the zoning ordinance is being used as cover for unlawful discrimination based on his race, religion, and national origin. Sheikh filed two lawsuits, one against neighborhood residents who opposed his building plans, and the other against the county, the city, and city officials. Both suits claim violations of federal and state law. The suit against the neighbors was assigned to Judge Dow, who dismissed it for failure to state a claim. The other suit was assigned to Judge Der-Yeghiayan, who dismissed some claims on the complaint and the remainder at summary judgment. We have consolidated Sheikh's appeals for decision, and we affirm both judgments.

Except as noted, the following facts are not disputed. Sheikh bought four adjoining lots in 2006. He wants to build a house to share with his wife and two adult children. Each lot is 140' by 60' for a total area of 33,600 square feet, but Illinois has a right-of-way that spans a portion of the lots and effectively reduces their total size by more than a third. The city had cautioned Sheikh before his purchase that, although the four lots together are big enough to accommodate a home of 6,156 square feet, no single lot is big enough for a residence of any size. The city noted that Sheikh would need a minimum of one zoning variance and its approval to combine the lots. And, the city added, "topographic information and review by an engineer would be needed to confirm the buildability of the lots" because they "may be located in a regulated floodplain."

Sheikh bought the lots anyway and soon faced neighborhood opposition in addition to zoning hurdles. The zoning ordinance's "contiguous lot requirement" prevents him from consolidating his lots unless he also buys and joins a fifth (because all five lots, at some earlier time, were jointly owned). The city council could grant a variance for undue hardship, but Sheikh would still have another problem: His combined parcels constitute a "corner" lot, which, given the state's right-of-way and the zoning ordinance's setback provisions, will force him to compress his house into a skinny, pie-shaped area. Variances from the setback requirements are handled by the city's Zoning Board of Appeals (which we will just call the zoning board since there is no other board that deals with zoning issues).

Sheikh could not reach a deal with the owners of the fifth lot, so in January 2009 he requested a hardship variance from the city council. The council instructed the zoning board to conduct a public hearing and make a recommendation, and Sheikh also asked the zoning board to grant setback variances. The zoning board first met informally with Sheikh and then convened the public hearing, which was continued several times at Sheikh's request so that he could address neighborhood concerns.

Sheikh did not wait for the zoning board's decision. In January 2011 he filed the first of these lawsuits claiming that the defendants, all neighborhood residents, had voiced opposition to his building plans because of their animus to his race, religion, and national origin. Judge Dow dismissed Sheikh's first amended complaint but invited him to seek leave to file another. Sheikh submitted a new version claiming violations of the Fair Housing Act, *see* 42 U.S.C. §§ 3604, 3617, civil rights statutes, *see* 42 U.S.C. §§ 1981–83, 1985(3), and Illinois law, but Judge Dow denied leave to amend after concluding that this proposed complaint fails to state any federal claim.

Meanwhile, in March 2011, the zoning board recommended that the city council approve a variance for undue hardship. But the board refused to alter the setback requirements after Sheikh had rejected its hint that he should seek another postponement and further modify his plans. The following month, the city council considered the zoning board's recommendation to grant Sheikh a hardship variance. A city attorney, Steven Elrod, reported that (unbeknownst to the zoning board) Sheikh had bought tax liens for the fifth lot and the redemption period had expired months ago. Because Sheikh likely could acquire that lot after all, the city council temporarily tabled the variance request.

Sheikh then sued Lake County and the city defendants. He claimed that the county had committed mail fraud and thus violated the Racketeer Influenced and Corrupt Organizations Act, *see* 18 U.S.C. § 1962, by misrepresenting the suitability of the lots he purchased. He also claimed that the city and its officials had discriminated against him in violation of federal law, *see* 42 U.S.C. §§ 1981–83, 3604, 3617, and likewise violated state law. Judge Der-Yeghiayan dismissed the RICO claim and many others, and afterward Sheikh sought leave to amend his complaint by dropping his RICO claim and instead alleging only that Lake County's misrepresentations about the size of his lots had violated state law. But Sheikh did not submit a proposed amended complaint, nor did he specify what state law was breached by the county's statements. After a hearing, Judge Der-Yeghiayan denied leave to amend with the explanation that supplemental jurisdiction over the new claim would be absent. The court later granted summary judgment for the city defendants on the remaining claims.

On appeal Sheikh has abandoned his RICO claim by not challenging its dismissal. *See Brumfield v. City of Chicago*, 735 F.3d 619, 625 (7th Cir. 2013). He contends, though, that Judge Der-Yeghiayan should have allowed him to filed an amended complaint against the county substituting for the RICO claim a state-law claim for misrepresenting the size of his lots. Sheikh argues that the district court would have had supplemental jurisdiction over this claim, but we decline to address that argument. Sheikh's failure to submit a proposed amended complaint is enough reason to uphold the denial of leave to amend. *See Arlin-Golf, LLC v. Village of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 590–91 (7th Cir. 2009). We need not say more about Lake County.

We turn next to Highland Park and its officials, who prevailed at summary judgment. We review that decision de novo, examining the evidence in the light most favorable to Sheikh. *See Ramos v. City of Chicago*, 716 F.3d 1013, 1014 (7th Cir. 2013). Sheikh contends that plenty of evidence suggests collusion by the city defendants with neighborhood residents bent on keeping him from building a home because of his race, religion, or national origin. We do not see it. Sheikh asserts that his claims are supported by e-mails and other interactions between city officials and the neighbors, yet there is nothing inherently suspicious about city officials communicating with their constituents, whatever the medium. And Sheikh points to nothing (nor do we see anything) in the e-mails suggesting unlawful discrimination behind the actions of the city officials—or, indeed, of the neighbors. Sheikh also believes that there is evidence to support a disparate-impact theory, *see Bloch v. Frischholz*, 587 F.3d 771, 784 (7th Cir. 2009); *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005), and along these lines asserts that all comparable variance applications were granted. But this assertion must be backed by evidence that the other applications involved properties and variance requests that are "identical or directly comparable in all material respects." *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010); *see also Harvey v. Town of Merrillville*, 649 F.3d 526, 531–32 (7th Cir. 2011) (finding no evidence to support allegation that residents were similarly situated). We cannot draw that conclusion based on this record. There simply is not enough evidence for a jury reasonably to find unlawful discrimination.

Sheikh also argues that Judge Der-Yeghiayan should not have dismissed a defamation claim against Elrod, the city attorney who reported that Sheikh had bought tax liens on the extra lot. That claim was dismissed on the pleadings, so we review the ruling de novo and construe the complaint in Sheikh's favor. *See Carmody v. Bd. of Tr. of Univ. of Ill.*, — F.3d —, 2014 WL 1266289, at *1 (7th Cir. 2014). Though Elrod spoke at a city council hearing, Sheikh argues that the lawyer cannot claim privilege because, on

Sheikh's view, Elrod's goal was to scuttle his variance request. But setting aside that Sheikh *did* buy the tax liens, this argument gets him nowhere, for in Illinois the immunity applicable to statements made as part of legislative proceedings is absolute. *See Krueger v. Lewis*, 834 N.E.2d 457, 464–65 (Ill. App. Ct. 2005); *Joseph v. Collis*, 649 N.E.2d 964, 972 (Ill. App. Ct. 1995); *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 707–08 (7th Cir. 1994).

All that remains is the separate lawsuit before Judge Dow against the neighborhood residents. Judge Dow concluded that the allegations in Sheikh's proposed, second amended complaint do not state plausible federal claims, and for that reason denied Sheikh's motion to amend. We review that decision only for abuse of discretion. *See Stanard v. Nygren*, 658 F.3d 792, 796–97 (7th Cir. 2011).

There was no abuse of discretion, but we are puzzled that the neighborhood residents have taken us down the long road to this conclusion. Sheikh sued them because they had voiced opposition to the variances he wanted from the city council and zoning board, yet the neighbors have never mentioned the *Noerr-Pennington* doctrine, which would seem a significant hurdle for Sheikh. That doctrine "protects litigation, lobbying, and speech … as an application of the first amendment's speech and petitioning clauses." *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135–36 (1961). Immunity under *Noerr-Pennington* applies "regardless of intent or purpose." *Pennington*, 381 U.S. at 670. Although the doctrine does not apply to sham lobbying efforts, *see BE & K Constr.*, 536 U.S. at 525–26, that exception is irrelevant to the neighbors' zoning arguments, for the city took the lobbying seriously (and, as we already have concluded, there is no evidence that the city or its officials unlawfully discriminated against Sheikh).

In any event, as we have said, Judge Dow did not abuse his discretion because he rightly concluded that the allegations in Sheikh's proposed complaint do not state a plausible federal claim. We tackle first Sheikh's arguments related to the Fair Housing Act; he argues that his proposed complaint states a claim under § 3617, which prohibits interference with rights protected by the Fair Housing Act. We accept at this stage that Sheikh's allegations are true. The neighbors opposed his building plans and showed up in large numbers at public meetings. (Though Sheikh calls the defendants an "Alliance," he does not allege that they actually were members of a neighborhood organization.) At least one person from all 37 households attended, says Sheikh, and the meetings were at times heated. Sheikh asserts that he was defamed at the hearing by (unattributed)

accusations that he "is after a fast buck," that "all he is looking for was a high-end address," and that "he was looking for a quick profit." He also says that the neighbors "cast a shadow over" his title to the property by calling his property "un-buildable." Along these lines, he specifically complains that one neighbor, Joel Kagan, "slandered and encumbered" his title by asserting that the property is prone to flooding. Another neighbor, Oded Orbach, "disparaged the subject property" by calling it "a big large gutter" covering an underground river.

The real impetus for this opposition, according to Sheikh, is his race, religion, and national origin, not his plans for building on the property. He reports that the neighbors made comments over the course of the dispute that reflected discriminatory views. Orbach once told him that the subdivision is "all white" and that he did not think Sheikh would "fit in." The neighbors sometimes referred to Sheikh and his family at meetings as "you people," and Hedy Barrocal suggested he move somewhere else, closer to his "people." At one meeting, David Rabin displayed pictures of narrow houses in poor countries, sarcastically suggesting that the pictures supported the conclusion that a narrow house should be enough for Sheikh. Another time, some of the neighbors (he does not specify who) expressed worry that Sheikh would allow more than one family to live in his house. (His two adult children will live in the house with him and his wife.) These neighbors talked about other areas in which one "colored family" moving in was a prelude to being "flooded by them" and about how some single-family homes rented by "latinos and blacks" ended up housing multiple families. Sheikh also alleges that Kagan said something threatening about the house burning down if it is built. (Though accepting as true that Kagan said something threatening, Judge Dow noted that the allegations are fuzzy. Sheikh's appellate brief hardly clarifies matters; he maintains that, whatever Kagan said, it was threatening, but he explains that he "can merely speculate on that threat" since only Kagan knows "his true intent.")

These statements, if made, are troubling. We certainly do not condone them, and they make this case closer than the neighbors' conclusory brief might suggest. (In their appellate brief the neighborhood residents do not specifically address any of the statements Sheikh attributes to them.) But the Fair Housing Act does not reach "isolated acts of discrimination by other private property owners." *Bloch*, 587 F.3d at 780; *see also Halperin v. Prairie Homes of Dearborn Park*, 388 F.3d 327, 330 (7th Cir. 2004) ("[W]e do not want, and we do not think Congress wanted, to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case."). And, ultimately, that is the most we plausibly can glean from Sheikh's allegations. By his account, residents from 37 different households opposed his plans during a zoning dispute lasting for five years. Only twice during that time did anyone speak explicitly

about race—Orbach once commented on the "all white" neighborhood (though Sheikh does not say when Orbach made the comment, where he made it, or whether anyone else was aware of it), and another time unidentified neighbors engaged in racially tinged conversation about perceived problems in other neighborhoods. Some additional, though less explicit, statements also plausibly relate to race, religion, or national origin: Rabin's sarcastic comments about narrow houses in poor countries, unidentified neighbors calling Sheikh and his family "you people," and Barrocal's suggestion that he move closer to his "people." But taken together, these allegations would establish only that different neighbors at different times made shameful statements, not that any individual neighbor (or the neighbors as a group) interfered with Sheikh's rights under the Fair Housing Act. *See Bloch*, 587 F.3d at 783; *Halperin*, 388 F.3d at 330.

Our conclusion is not altered by the allegation that Kagan said something threatening about Sheikh's house being burned. Sheikh's only attempt at connecting that threat to discriminatory intent is the allegation that Kagan, at a city council meeting, had declared: "I don't want you here, I don't want you in my sub-division. We told you many times, why don't you listen[?]" This statement does not plausibly allege discriminatory intent and, in any event, does not even appear to be what Kagan said. Sheikh's rendition of the statement was different in his first amended complaint, in which he alleged: "One member of the Alliance, Joel Kagen [sic] openly said during the Board hearings, 'I told you I don't want you there', (in the village of woods subdivision) and then went on to state that I have told you many time [sic], I think you don't understand that 'I don't want that house built.'" Yet another version appears in Sheikh's appellate brief, which asserts that Kagan stated, "I don't want that house built in this neighborhood." And all of these variations differ from the transcript that Sheikh made part of the record in the lawsuit against the city defendants. According to the transcript, Kagan told Sheikh: "You are not listening. You have sat here every meeting and never listened to a word that anybody in this room says other than your own agenda. I don't want the house. I don't want you living there. I don't want the house. But I am telling you, if you listen to what these people are telling you, talk to [your lawyer], get a different architect that works with the City, and you will have a chance of having a home in Highland Park."

Sheikh's failure to allege more than isolated acts of discrimination also dooms his attempt to state claims under § 1982 and § 1985(3), provisions that likewise target racially motivated interference (and conspiracies to interfere) with Sheikh's rights. *See Bloch*, 587 F.3d 771 n.5; *Gallagher v. Magner*, 619 F.3d 823, 839 (8th Cir. 2010).

Sheikh's remaining contentions also fail. First, claims under § 1983 must be brought against state actors, *see American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007), but Sheikh alleges, at most, that the neighbors knew the city officials well and lobbied hard against the variances (and that some city officials shared their views on zoning requirements). Successful lobbying, though, does not turn the neighbors into state actors.

Second, § 1981 requires plausible allegations of a contract (or a proposed contract), *see Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479–80 (2006); *Gonzalez v. Ingersoll Mill Mach. Co.*, 133 F.3d 1025, 1034 (7th Cir. 1998), but Sheikh does not plausibly allege that a contract was (or was about to be) in play. He attempts to make up for this shortcoming by saying in his appellate brief that "[i]t is a common practice of the Zoning Boards, that a lot of times, the developers or the home owners enter into contracts with the Zoning Boards." Yet this follow-up explanation is also inadequate; it does not say that there actually was a proposed contract here or even that the city makes it "a common practice" to enter into zoning contracts with homeowners.

One final issue: The neighbors ask, at the end of their response brief, that we "consider awarding [them] their attorneys' fees" under 42 U.S.C. § 1988. The entire litigation was frivolous, they say, and was intended to "silence" their zoning objections, so they want to recoup all fees reasonably incurred during the litigation or, at least, during this appeal. But they cannot get fees for litigating in the district court because they failed to file a motion for fees before Judge Dow. *See* FED. R. CIV. P. 54(d)(2)(B) (providing that party requesting attorney's fees has 14 days from entry of judgment to file motion); *Bender v. Freed*, 436 F.3d 747, 750 (7th Cir. 2006) (ruling that motion for fees filed after 14-day deadline was untimely). As for appellate fees, apart from asserting that the lawsuit is entirely frivolous—an overreach in any event—the neighbors have not attempted to explain why they ought to recoup anything. *See Fox v. Vice*, 131 S. Ct. 2205, 2215 (2011) ("Section 1988 allows a defendant to recover reasonable attorney's fees incurred because of, but only because of, a frivolous claim."). And to top it off, their inadequate request comes at the end of a conclusory brief that does little to elucidate the issues before us—failing even to specifically address the troubling statements that Sheikh alleges or to discuss the *Noerr-Pennington* doctrine.

The judgments are **AFFIRMED**.