In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3845

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONTA GROCE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:15-cr-78 — **William M. Conley**, *Judge.*

ARGUED DECEMBER 7, 2017 — DECIDED MAY 23, 2018

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge*. Monta Groce appeals witness-retaliation and sex-trafficking convictions. The government concedes the retaliation jury instruction failed to state a particular unsupported element. We vacate the retaliation conviction and remand for resentencing. Regarding sex trafficking, Groce raises several challenges. He argues the court erred by 1) excluding evidence of the victims' alleged prostitution histories; 2) barring cross-examination of a victim

on her alleged prostitution history after she testified she had
no such history; 3) issuing an instruction lowering the *mens
rea* required for sex trafficking; and 4) admitting prejudicial
evidence of uncharged sex trafficking. He also argues
cumulative error requires retrial. We affirm the sex-trafficking
convictions.

## I. Background[1]

Groce faced nine counts: 1–3) sex trafficking; 4) conspiracy
to engage in interstate transportation for prostitution; 5)
interstate transportation for prostitution; 6) maintaining a
drug house; 7) using or carrying a firearm in maintaining the
drug house; 8) attempted sex trafficking; and 9) witness
retaliation. The jury heard evidence he abused and coerced
two women to cause them to prostitute involuntarily. He
preyed on their drug addictions and other vulnerabilities,
manipulated debts, and physically abused or threatened
them. The jury also heard evidence he caused a third woman
to prostitute involuntarily. He was convicted on all but Count
8, and sentenced to 25 years in prison. He only appeals the
sex-trafficking and retaliation convictions.

### A. Lisa Tischer (Count 1)

When Lisa Tischer met Groce in November 2012, she was
a heroin addict. He led her to believe he had romantic feelings
for her. Soon she lost her job and violated drug-related
probation. He offered a place to stay, so she lived with him in
Sparta, Wisconsin. He gave her heroin. At first he did not
charge or she paid $30 to $40. Soon he said she could do

---

[1] We draw the facts and quotations in this section from the trial record.
We present summaries of each woman's testimony.

calls—have sex for money—to get heroin from him. Groce said if she loved him, she would do the calls. He told her she would earn $150 to $500. So she prostituted. He arranged and controlled the prostitution. At first she got 40% and did five to fifteen calls on an average day. She continued using heroin, buying it with prostitution funds. He reduced her share. Finally, he wanted it all. He imposed rules, and isolated and punished her. She could only leave if he approved. He slapped her face and fined her $500 for meeting with someone. He said she was disgusting and he advertised her for full service for $50. She tried to leave but he stopped her by guarding the stairs. He controlled her heroin access and induced her to prostitute before giving her heroin. He withheld heroin if she tried to leave or keep money. She felt "dope sick," "[v]ery sick, depressed, useless." He burned her with a cigarette when she kept funds. After hearing she talked to the police, he said he would rape and kill her mother and sister. Tischer testified she did not want to do calls, but did them to make him happy and to avoid dope sickness. Once, when he was out, she used his phone to get a ride to leave. But he returned, saw her stuff packed, slapped her face a few times, and made her stay downstairs. Once, he threatened to kill a young man and told her to get his gun. She hesitated. Groce said if she did not get it, he would get it and she and the man would be sorry. So she got the gun for Groce.

She left around January 2013, but he found her. He said he changed and was sorry. So she moved into his small room. After locking her in twice, he asked her to do a call. She refused. He locked her in again. She felt withdrawals. He said she must do a call. Seeing it as her only escape, she did it. Later, he beat her for reporting to authorities.

### B. Mirika Stuhr (Count 2)

Mirika Stuhr met Groce in November 2012. He supplied her heroin. She started living with him at the Sparta house. She had a "crush" on him. After suffering much abuse, including a cigarette burn to her face, Tischer got a ride and left with Stuhr's help. Groce blamed Stuhr and asked her to do a call. She agreed, but Groce had to teach her what to do. Groce kept $60, gave her $40, and also gave her heroin. She was addicted and regularly bought it from him. She testified heroin addiction means "you can't go without it. It means you will do anything at any cost to make sure that you have it." She testified she had never taken calls for anyone else.

She continued prostituting. Groce cut off free heroin. So she used her $40 a call to buy it, but he charged $50. So she always owed him. She had trouble leaving because if she missed a call she would owe him. He took her phone sometimes. Once, he allowed her out, so she left and used meth. Then he called to say she had a customer. She returned around 3:00 am. She had picked her legs bloody and raw due to meth. Unable to sit still, she asked for heroin so she could do the call. But he refused as she had missed calls and owed him. She said she could not do it. He eyed his gun and said, "'You always have a choice.'" Scared, mad, and alone, she cried and did the call. Besides owing for drugs and missing calls, she also owed for unplugging his phone while cleaning, taking too long on his laundry, and failing to report. Once, when she withheld funds, he told her she was a dead duck, was cut off, and would not get calls or drugs. She felt scared, alone. Once, he punished her by isolating her, taking her phone, and depriving her of drugs and food. Suicidal, suffering withdrawal, and under a warrant, she had nowhere

to go. Finally he asked, "'Are you ready to make some money[?]'" meaning, "Are you ready to take a call[?]" Her testimony shows her dungeon's depravity: "In one way that's all I mattered for and on one side, thank God I can finally feel better." After she took a call on Groce's bed, he beat her, and she left. But she suffered withdrawals and resumed buying drugs from him. She later lived with him again and continued prostituting, giving him all the funds. She still used drugs. She also testified about texts tending to corroborate her.

### C. Amanda Ryan (Count 3)

Amanda Ryan was a certified nursing assistant on heroin when she moved to the Sparta house. She could not function without drugs, which Groce sold her. Struggling to pay, she agreed to prostitute "against [her] better judgment." She kept prostituting for him, halving the funds, but using hers to buy drugs from him. He was "manipulative, narcissistic, controlling." He "had the heroin, so it was basically what he said goes." He "had a gun and he wasn't afraid to show it." She lost his debit card. He insisted she prostitute to repay. She said she had to go to work. He persisted: "'You're not going until you do this call, otherwise I'm cutting you off—I'm not giving you any heroin.'" Seeing no choice, she did a call against her will, felt like trash, then got drugs. She did not really want to do any calls, but only did them for drugs. Groce threatened to cut her off.

### D. Melissa Copeland (Count 4—not appealed)

Melissa Copeland testified she and Groce were childhood friends. In April 2013, he asked if she wanted to make $150 and she agreed. She considered him a friend and did not think he meant anything harmful. Someone drove her to a

residence, which she entered, still not knowing what to expect. A male asked her to engage in a sex act. She did. He paid. The driver returned her to Groce, who demanded money. When she refused he threw her down, forced her head to the pavement, reached in her bra, and took some money. She saw his gun. He said essentially, "'They're not going to catch me.'" She testified she had never done anything like that before. On cross Groce's attorney challenged her, asking if she remembered prostituting in Milwaukee. She again denied being a prostitute. The attorney pressed: "Never done that before?" She responded: "I don't even have it on my record." The government objected, and the court sustained.

## II. Discussion

Groce appeals multiple issues. We evaluate his arguments in turn.

### A. Witness-retaliation conviction

Groce seeks dismissal of the retaliation conviction because the instruction lacked an element: the witness communicated with a *federal* officer. The government concedes. The instruction was erroneous, and the evidence did not support conviction. We vacate the Count 9 conviction and remand for resentencing on the remaining convictions.

### B. Exclusion of victims' alleged prostitution histories

For sex trafficking, the government had to prove Groce acted "knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion … or any combination of such means will be used to cause the person

to engage in a commercial sex act." 18 U.S.C. § 1591(a).[2] Groce insists he could not have known or recklessly disregarded that force, *et cetera*, would be used to cause the victims to prostitute because he knew they prostituted before working for him. He claims the victims' prostitution histories were relevant to his *mens rea* and the court erred by excluding this evidence under Rule 412, yet it allowed the government to elicit testimony from Stuhr that she never prostituted before meeting Groce. He contends this gutted his defense. Specifically, under Rule 412(a) the government moved in limine to exclude evidence of the victims' other sexual behavior or sexual predisposition. It also sought exclusion per Rule 403 for unfair prejudice and potential confusion. Groce claimed relief under the Rule 412(b)(1)(C) "constitutional rights" exception. Relying on *United States v. Cephus*, 684 F.3d 703, 708 (7th Cir. 2012), the court excluded the evidence per Rule 412, and agreed Rule 403 also bars it.

Groce seeks *de novo* review, claiming the exclusion violated his constitutional rights. But the government urges only plain-error review because the basis for Groce's challenge on appeal is new: below he claimed the victims' prior prostitution was relevant to whether they voluntarily prostituted for him; but now he claims it was relevant to his *mens rea*. Usually we review evidentiary decisions for abuse of discretion. *See United States v. Fifer*, 863 F.3d 759, 767 (7th Cir. 2017). But under any standard, Groce loses.

Federal Rule of Evidence 412(a) bars "evidence offered to prove that a victim engaged in other sexual behavior." An

---

[2] We refer to "means of force, threats of force, fraud, coercion … or any combination of such means" as "force, *et cetera*."

exception allows admission of "evidence whose exclusion would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C). Groce claims the evidence of the victims' prior prostitution was vital as virtually the only evidence of his state of mind. He argues if the jury knew *he* knew of the prior prostitution, it might have concluded *he* reasonably believed the women were prostituting voluntarily. Or if not, at least it could have concluded he was not criminally reckless in disregarding the fact that force, *et cetera*, would be used to compel them to prostitute. Groce argues Ryan was legitimately employed, willingly engaged in prostitution to support her heroin habit, and independently expanded her prostitution business. He claims he never threatened her with force. He argues he only denied Tischer and Stuhr heroin when they could not pay for it. He insists none of the violence against them was used to compel prostitution. His basic point is he could not have known or recklessly disregarded that force, *et cetera*, were used to compel the women to prostitute because he knew they were already prostitutes.

This argument fails for several reasons. Most importantly, we already rejected it. In *United States v. Cephus*, we said, "even if [a victim] knew going in, from her prior [prostitution] experience, that [defendant] probably would beat her, it was still a crime for him to do so." *Cephus*, 684 F.3d at 708. Groce argues *Cephus* did not address the relevance of the victims' prior prostitution to a defendant's state of mind, but only prohibited the use of prior prostitution to prove the victims' consent to subsequent prostitution. But, as the government notes, we recently rejected that argument in *United States v. Carson*, where we held a victim's prior sexual conduct is irrelevant to the sex-trafficking *mens rea*: "whether the victims had previously worked as prostitutes was irrelevant to the

required *mens rea* for the crime." *Carson*, 870 F.3d 584, 593 (7th Cir. 2017). Groce ultimately concedes *Carson* forecloses his argument. He asks us to overrule *Carson*, but we decline. The district court did not err when it excluded irrelevant evidence.[3]

## C. Stuhr's testimony regarding lack of prior prostitution

The government elicited testimony from Stuhr that she never prostituted before meeting Groce. He complains that despite a proffer that this testimony was untrue, the court refused to allow him to cross her on this issue, thereby violating his right to confront the government's key witness. As noted, Groce concedes *Carson* forecloses his argument that Tischer's and Ryan's prior prostitution was relevant to his *mens rea*. Still, he argues *Carson* does not control the outcome regarding Stuhr because unlike the government in *Carson*, the government here elicited testimony that Stuhr had not previously prostituted. Groce claims the government opened the door and put her prostitution history at issue.

A court has broad discretion to limit cross, within the Confrontation Clause's bounds. *Carson*, 870 F.3d at 596. The Confrontation Clause "guarantees a defendant an opportunity for effective cross-examination, but there is no guarantee of cross-examination to whatever extent the defense might wish." *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) (internal quotation marks and alteration

---

[3] Moreover, overwhelming evidence established he did not merely *recklessly disregard* that his conduct caused the victims to prostitute. He *knew* it. The evidence showed a pattern of physical abuse, threats, and coercion including controlling heroin access and manufacturing debt. He was not merely a bystander; he was the controller and actor.

omitted). We review a limit on cross *de novo* if it directly implicates the Confrontation Clause's core values; otherwise we review for abuse of discretion. *Id.* Impeaching a witness is a core value. *United States v. Clark*, 657 F.3d 578, 583 (7th Cir. 2011). Exposing "a witness's motivation, biases or incentives for lying" is a core value. *Carson*, 870 F.3d at 597. But "once a trial court permits a defendant to expose a witness's motivation, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Recendiz*, 557 F.3d at 530 (internal quotation marks omitted). The Confrontation Clause "does not give a defendant a boundless right to impugn the credibility of a witness." *Clark*, 657 F.3d at 584. The court has "wide latitude … to impose reasonable limits on such cross-examination based on concerns about … harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "If the defendant already has had a chance to impeach the witness's credibility and establish that she has a motive to lie, then any constitutional concerns vanish and we review the district court's decision to limit additional inquiries only for abuse of discretion." *Clark*, 657 F.3d at 584; *see also United States v. Kielar*, 791 F.3d 733, 743 (7th Cir. 2015). Even if the court errs in barring cross, "that error is harmless depending upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence, and the overall strength of the prosecution's case." *Carson*, 870 F.3d at 597.

We review for abuse of discretion because Groce had ample opportunity to impeach Stuhr on cross and through another witness. Groce impeached Stuhr on cross by raising her past drug use, past convictions, and flawed memory. He further challenged Stuhr's credibility through the testimony of Brandy Eddy that Stuhr prostituted before meeting Groce. After all, Groce argues Eddy's testimony casts significant doubt on the truthfulness of Stuhr's testimony. Abuse of discretion is, of course, a highly deferential standard. We give special deference to evidentiary rulings "because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding." *United States v. Suggs*, 374 F.3d 508, 516 (7th Cir. 2004) (citations omitted). A trial court abuses its discretion when "no reasonable person could take the view adopted by the trial court." *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005). Here, given the other methods employed to impeach Stuhr, given the record as a whole, and given the requirements of Rule 412, the court did not abuse its discretion in barring Groce from crossing Stuhr on her alleged prostitution history.

### D. Sex-trafficking jury instruction

Two states of mind support sex-trafficking: knowledge or reckless disregard. 18 U.S.C. § 1591(a). The court instructed the jury on the definition of "recklessly disregards":

> As used in Counts 1, 2, 3 and 8, a person **recklessly disregards** a fact when he is aware of, but consciously or carelessly ignores, facts and circumstances that would reveal the fact that force, threats of force, or coercion would be

used to cause another person to engage in a commercial sex act.

(Jury Instr., Groce's Separate App. at 77, emphasis in original.)

Groce argues the court plainly erred by instructing the jury it could find he acted with reckless disregard if he carelessly ignored the relevant facts and circumstances. Groce argues this lowered the *mens rea* from criminal recklessness (which requires actual awareness of a substantial risk and conscious disregard of it) to mere negligence. He claims this plain error impaired his substantial rights because although he might have been careless, there is a reasonable probability a jury would not have found him reckless.[4] Groce's main point is the instruction misstated the law by failing to require for conviction that he consciously disregarded the relevant facts and circumstances. He argues that because the court excluded evidence that he did not have the requisite *mens rea* for the offense (because he knew about the victims' prior prostitution), and then lowered the *mens rea* with the erroneous instruction (allowing mere negligence to suffice), the court allowed the jury to convict him of sex trafficking without requiring proof of all elements.

Normally we review *de novo* whether instructions accurately state the law, giving substantial discretion to the district court over the precise wording "so long as the final result, read as a whole, completely and correctly states the law." *Karahodzic v. JBS Carriers, Inc.*, 881 F.3d 1009, 1016 (7th

---

[4] Groce concedes the district court's definition of "recklessly disregards" was based on a Committee Comment in our pattern jury instructions, but argues neither case cited in that comment supports the definition.

Cir. 2018). But Groce did not object below to the instruction under Federal Rule of Criminal Procedure 30(d), so our review is limited to plain error. Fed. R. Crim. P. 30(d) and 52(b); *United States v. Cheek*, 3 F.3d 1057, 1060 (7th Cir. 1993). He concedes and only requests plain-error review. "A plain error is not just one that is conspicuous but one whose correction is necessary to prevent a miscarriage of justice." *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988) (internal quotation marks omitted).

But Groce arguably did more than merely forfeit his argument by not objecting; he arguably waived it by telling the district court he had no objection to the proposed instructions, which included the "or carelessly ignores" language. In *United States v. Natale*, 719 F.3d 719, 729–31 (7th Cir. 2013), we examined the important distinctions between passive forfeiture and affirmative waiver. A defendant who forfeits his argument by not objecting to an instruction before deliberation may attack that instruction on appeal only for plain error, but a defendant who waives his argument cannot even seek plain-error review. The problem sometimes is determining when waiver occurred. Waiver "occurs only when a defendant makes a knowing and intentional decision to forgo a challenge before the district court." *Natale*, 719 F.3d at 729 (internal quotation marks omitted). We noted that "affirmative statements as simple as 'no objection' or 'no problem' when asked about the acceptability of a proposed instruction have resulted in waiver" because of the difficulty in determining the subjective motivations behind such statements. *Id.* at 730. Since this approach can produce "especially harsh results," we proposed alternative theories. *Id.* at 730–31. But we did not resolve the applicability of these

theories because even under plain-error review, we found no error requiring a new trial there. *Id.* at 731.

So here. Even under plain-error review, we find no error requiring a new trial. Under plain-error review, we will reverse only for an obvious error that affects the defendant's substantial rights and seriously impugns the fairness, integrity, or public reputation of judicial proceedings. *Id.*; *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010). The government concedes the instruction was wrong. Let us say it was obviously wrong, and should not have been given in any case. Still, Groce cannot show this error affected his substantial rights. That is, he cannot show a reasonable probability that but for the error the outcome would have differed, because overwhelming evidence demonstrated he did not merely *recklessly disregard* but he *knew* force, threats of force, and coercion were used to cause the victims to engage in commercial sex acts. Overwhelming evidence demonstrated he knew, and did not merely recklessly disregard, that his deliberate pattern of physical abuse, threats, and heroin control caused the victims to prostitute.

For example, he confined Tischer to the Sparta house where she performed calls, not allowing her to leave without his permission. He controlled her heroin access, punished her, physically assaulted her, and burned her with a cigarette. He threatened her. He locked her inside the second residence several times. He forced her to prostitute. He also controlled Stuhr's access to heroin. He manufactured debt for her, confiscated her phone, isolated her, and threatened her with a gun. He deprived her of heroin and even food until finally he asked if she was ready to take a call. He forced her to prostitute. He also controlled Ryan's access to heroin. He

insisted she engage in a commercial sex act to repay him for losing a debit card. He forced her to prostitute. The evidence against Groce is overwhelming. There is no reasonable probability the erroneous jury instruction changed the outcome.

### E. Copeland evidence

The Copeland evidence was relevant to the charged conspiracy. Groce does not appeal that conviction but he does appeal the admission of this evidence due to risk of unfair prejudice on the sex-trafficking charges. Copeland and Groce were childhood friends, but he sandbagged her to prostitute, battered her, and took her money. He complains the court erred by admitting this evidence, which had minimal relevance and was cumulative of other conspiracy evidence. He claims the Copeland evidence was unfairly prejudicial because it created a substantial risk the jury would rely on it to decide his guilt on the sex-trafficking charges. He argues the evidence was disputed regarding whether the sex-trafficking victims prostituted voluntarily, but the government injected into the sad combination of bizarre and drug-infested relationships Copeland's stark testimony, which might have persuaded the jury he was the type to sex-traffic. He argues the court should have barred it under Rule 403.

There is debate on the standard of review but under either plain-error or abuse-of-discretion, Groce loses. On abuse-of-discretion review we "defer to the district court unless no reasonable person could adopt its view." *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014). Plain-error review requires an obvious error affecting Groce's substantial rights and seriously impugning the fairness, integrity, or

public reputation of judicial proceedings. *Natale*, 719 F.3d at 731; *United States v. Klemis*, 859 F.3d 436, 440–42, 445 (7th Cir. 2017). That is, Groce must show a reasonable probability he would have been acquitted had the court barred this evidence. *Klemis*, 859 F.3d at 445. Rule 403 allows barring if the "probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. But Groce loses his challenge because the Copeland evidence was direct evidence of the charged conspiracy. "We start with the premise that direct evidence of a crime is almost always admissible against a defendant." *United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010). This was not merely evidence of other bad acts; this was direct evidence of a charged crime. He asks us to reweigh it on the Rule 403 scale and argues dangers of needless accumulation and unfair prejudice substantially outweigh its slight probative value. But we see no reason to disturb the court's decision. The sex-trafficking evidence was overwhelming.

### F. Cumulative error

Groce claims the cumulative effect of the errors denied him a fair trial on sex trafficking. Cumulative error exists where at least two errors committed during a trial denied defendant a fundamentally fair trial. *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010); *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). To demonstrate cumulative error, Groce must establish at least two errors occurred, and "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *United States v. Allen*, 269 F.3d 842,

847 (7th Cir. 2001). On a claim of cumulative error, we consider both—but only—plain or preserved errors. *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012). We only reverse if "the errors, considered together, could not have been harmless." *Adams*, 628 F.3d at 419.

Here, no claimed errors warrant reversal of the sex-trafficking convictions as any errors were harmless. Overwhelming evidence proved he committed sex trafficking. The jury heard extensive testimony about his assaults, threats, and heroin control. He manipulated debt. He punished, isolated, and detained his victims. There is no reason to think any two or more potential errors combined to deprive him of a fundamentally fair trial. The record demonstrates his guilt "such that none of the asserted errors, either individually or cumulatively," could have affected the verdict. *Id.* at 420.

### III. Conclusion

We VACATE the conviction for witness retaliation and REMAND for resentencing. We AFFIRM the district court in all other respects.[5]

---

[5] We close with a reminder that the jury convicted Groce on all but Count 8 of nine counts. He appeals only the convictions on sex trafficking (Counts 1–3) and retaliation (Count 9). The 25-year sentence was for the convictions we affirm, the conviction we vacate, and the convictions he did not appeal.