In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 17-3448

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MAURICE A. WITHERS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:16-cr-00005 — **William M. Conley**, *Judge*.

———————————

ARGUED SEPTEMBER 6, 2019 — DECIDED MAY 28, 2020

———————————

Before EASTERBROOK, KANNE, and BRENNAN, *Circuit
Judges*.

BRENNAN, *Circuit Judge*. Maurice Withers made a living
trafficking women and girls for sex. After months of abuse,
numerous victims were identified by law enforcement. With-
ers was arrested and charged with nine counts of sex traffick-
ing.

As the case proceeded to trial, the government proposed jury instructions on four of those counts that would have allowed Withers to be found guilty if he either knew or recklessly disregarded that force, threats of force, or coercion would be used to cause the women to engage in commercial sex acts. The "recklessly disregarded" *mens rea* element was absent, however, from the superseding indictment against Withers. The district court ruled, and the parties agreed, that the jury instructions would not include that phrase. Yet at trial the court's instructions included this phrase, and neither the court nor the parties recognized the error. A jury found Withers guilty on all counts.

On appeal Withers challenges the four convictions that included the inaccurate instructions, arguing the jury was improperly allowed to consider a lesser mental state. While we agree those instructions were plainly wrong, we conclude that the error did not affect Withers' substantial rights or otherwise prejudice his trial, so we affirm.

## I. Background[1]

From February to August 2015, Withers recruited women and girls to prostitute and advertised their services on websites such as Backpage.com, Craigslist.com, and other online dating platforms. Withers transported the women and girls to various Wisconsin cities, as well as to Iowa and Nevada, where he forced, threatened, and coerced them to engage in sex acts for money that he would keep.

---

[1] We draw the facts and quotations in this section from the trial record. Where relevant, we present summaries of each woman's testimony.

Seven women testified at trial to being sexually exploited by Withers: Tiffany Campbell, Samantha Young, Lindsay Sardeson, Z.K., J.K.,[2] Cassandra Dillman, and Rebekah Mast. We review relevant facts from their testimonies to inform our evaluation of Withers' appeal.

### A. Tiffany Campbell (Counts 1 and 3)

In February 2015, Campbell, a 32-year-old single mother, was working as a bartender and a dancer and living in a hotel in the Wisconsin Dells with her four children. She became acquainted with Withers on Facebook and soon divulged "everything" about her life and current situation to him. They met in person and started a romantic relationship.

A month later, when Campbell became distraught about her worsening financial situation, Withers suggested she post an advertisement on Backpage.com to earn extra money performing massages. She explained to Withers she did not want to have sex for money. Despite Campbell's hesitancy, Withers advertised her on Backpage. Soon Campbell was performing sex acts for money.

By March, Withers was regularly posting Backpage ads for Campbell's services. He paid for the ads, set the prices for her services, planned dates, drove her to dates, waited in the car during her dates, instructed her to get the money upfront, and pressured her to "upsell." Withers took all the money she made, even though their original agreement envisioned a

---

[2] Minors Z.K. and J.K. are not part of this appeal, although they testified against Withers at trial.

60/40 split in her favor. Under Withers' direction and control, Campbell was doing dates every day, often more than once.

With Withers controlling Campbell's money, her bills were overdue, her phone service was shut off, and her car was repossessed. She was allowed access to a phone only when Withers permitted. Both Campbell and Withers abused a variety of illicit drugs, which Withers purchased and supplied.

Withers also recruited Z.K., a minor who started doing dates for Withers, sometimes in conjunction with Campbell. In late April, Withers drove Campbell, Z.K., and a third woman, Sardeson, from Madison, Wisconsin to Las Vegas, Nevada.[3] Withers arranged dates for the women along the way. In Las Vegas, they stayed in hotel rooms that Withers rented, and the women performed dates Withers arranged for them on Backpage. Withers controlled their access to phones, money, and food. Campbell testified she felt she could not leave because she had no money and no transportation.

Withers had become more physically aggressive, often cornering Campbell so she could not move and yelling at her "nose to nose," spitting in her face. When Withers discovered Campbell had been communicating with her children's father, he became angry. He broke down the door to a bathroom where Campbell was hiding, screamed at her, threw her against the wall, and almost hit her before Z.K. intervened.

---

[3] Neither Campbell nor Z.K. had met Sardeson before, but Campbell understood Withers intended to traffic all three of them. Sardeson testified she did not know Withers was a pimp and did not anticipate her agreement to meet him in person would result in her being sex trafficked by him.

On another night, after Campbell's plan to escape Las Vegas with Z.K. failed, Withers grabbed Campbell by the throat, threw her on the hotel bed, kicked her in the ribs, choked her, spit on her, punched her in the head, pulled her hair, and told her not to move. According to Z.K., Withers told her he beat Campbell because they had tried to leave. During their time in Las Vegas, Campbell also witnessed Withers smack Z.K. across the face in public.

After returning to Wisconsin, Campbell stayed with Withers and continued to do dates for him because she felt "broken" and "pretty much numb" by then. Withers recruited another woman, Young, and instructed her to arrange dates for Campbell on Backpage. One evening, Withers drove them both to Dubuque, Iowa so Campbell could do dates there. Campbell told Withers she no longer wanted to do dates and was asking to go home. The two began to fight in the car. Withers punched Campbell in the head, pulled her hair, and threw a CD case at her face.

After that incident, Withers told Young he believed Campbell was going to try to escape to avoid going on more dates. When Campbell ran out of their hotel room barefoot just before a scheduled date, Withers instructed Young not to let Campbell get away. Crying and clearly upset, Campbell ran to a nearby restaurant and asked to use the phone. Campbell called her aunt, who came to pick her up.

### B. Samantha Young (Count 4)

Young met Withers in 2006 when she was 18 years old, and they lived together for a short time. In August 2015, the two reconnected, exchanged phone numbers, and began seeing each other again. While the relationship was "friendly," and

even sexual, Young did not consider it an intimate, dating relationship. Young was eight months pregnant at the time and had just gotten out of a relationship with a controlling and physically abusive boyfriend.

While together at a friend's house, Withers grabbed Young's face because he thought she was "too friendly" with another guest. This scared her. Her fear grew as she witnessed Withers force Campbell to perform sex acts despite Campbell's repeated refusals. Young heard Campbell repeatedly tell Withers she did not want to do dates, and Young watched Withers grab Campbell and hit her in the face, bruising her chin almost immediately.

Soon after, Withers posted a Backpage ad for Young. Withers told her she needed to do a date to make money for him, but he assured her it would involve only a massage. According to Young, she did not want to go but complied because she had observed Withers' abuse of Campbell and did not want him to abuse her during her pregnancy. In one night, Withers arranged three dates for Young on Backpage, two of which involved sex acts. During the third date, Young could not complete the sex act because she felt nauseated and threw up three times. The customer gave her the money anyway, which Withers demanded from her.

### C. Lindsey Sardeson (Count 9)

Sardeson met Withers at a party, and by March 2015 the two were communicating over Facebook. During this time, Sardeson was on probation in Columbia County, Wisconsin and not allowed to leave the county without permission from her probation officer.

In April, Sardeson and Withers arranged to meet in person to go to the Wisconsin Dells. When Withers came to pick her up, Sardeson was surprised to see Campbell—whom she had never met—in the car. Sardeson had assumed she and Withers were going to be alone.

Withers drove the three of them to Madison, despite Sardeson telling him she could not leave the county per her probation order. In Madison, they made several stops to collect belongings, including a gun Sardeson saw Withers place in a gym bag. They also picked up Z.K. When Sardeson repeated that she wanted to go home, Withers told her he would drop her off but that she should not be "argumentative" and just listen to him.

Sardeson soon realized they were in Dubuque, Iowa. She pleaded with Withers to turn around as she was already in violation of her probation. Withers refused. He informed her they were going to Denver, Colorado to purchase legal marijuana. Sardeson felt she could either get out of the car and fend for herself or ride with them to Denver. Assuming Withers would eventually take her back to Wisconsin, she stayed in the car.

Sardeson was upset when Withers revealed they would be continuing to Las Vegas, and she became alarmed when he began posting Backpage ads for her to perform sex acts for money along the way. Before leaving Denver, Withers set up a date for Sardeson, Campbell, and Z.K. with one customer. When they told Withers the customer did not pay them for the date, Sardeson saw Withers slap Campbell and rummage through their things looking for cash he believed they were hiding from him.

Despite Sardeson's protests, they continued to Las Vegas where Withers arranged multiple dates for each of them. Withers dropped them off several times in an area known as "The Blade," which Sardeson described as very dangerous. Withers took the money the women earned and controlled their access to phones and food. When Sardeson became "argumentative," Withers withheld food from her entirely. Sardeson testified that sometimes she had to beg him for food.[4] While in Las Vegas, Withers took Sardeson to his car alone. He told her to perform a sex act for him, and he slapped her when she told him she did not want to do it. Sardeson complied, explaining later she did so out of fear.

### D. Cassandra Dillman and Rebekah Mast (Rule 404(b))

In addition to the women and girls discussed above, two other women, Cassandra Dillman and Rebekah Mast, were previously part of Withers' activities. The court permitted them to testify to show "other acts" evidence under Federal Rule of Evidence 404(b)(2) on the question of Withers' intent.

Dillman met Withers when she was 20 or 21 years old. He encouraged her to start doing massages to make money. For four or five months, Withers posted advertisements for her services online and arranged for her to conduct massages at her parents' house. Withers pressured her to upsell from massages to sex acts. When Dillman told Withers she no longer wanted do dates for him, he became physically aggressive—showing up at the house where she was staying, pounding on the doors and windows, and yelling for her to come outside.

---

[4] Sardeson is hypoglycemic and experiences low blood sugar when unable to eat for extended periods. She testified Withers knew of her condition when he denied her food.

He called her repeatedly and threatened to tell her parents she had been performing sex acts for money. It was Dillman who ultimately reported Withers to the police.

Withers also advertised Mast's massages online. At least one of the massages Mast did for Withers also included a sex act. Mast refused to give Withers all the money she earned, so Withers "ditched her" at the hotel where the date had occurred because "that [is] not how his operation works."

### E. Pretrial and Trial Proceedings

Withers was charged with nine counts of sex trafficking. Counts 1, 4, and 9 of a superseding indictment alleged he recruited, enticed, harbored, and transported Campbell, Young, and Sardeson across state lines while knowing that force, threats of force, coercion, or any combination of such means would be used to cause them to engage in commercial sex acts in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1). Count 3 charged Withers with attempted sex trafficking of Campbell in violation of 18 U.S.C. § 1594(a).

At a pretrial conference, the government submitted its proposed jury instructions. For the second element of Counts 1, 3, 4, and 9, the proposed instruction read: the "defendant either *knew, or recklessly disregarded* the fact that force, or threats of force, or coercion … would be used to cause [the victim] to engage in a commercial sex act." (emphasis supplied). The superseding indictment did not contain the "recklessly disregarded" language.

During the final pretrial conference, the court and the parties agreed that only the knowledge *mens rea* element should be included in the jury instructions for Counts 1, 3, 4, and 9, consistent with the charged language in the superseding

indictment.[5] But six weeks later at the trial, the phrase "reck-lessly disregarded" was included in the jury instructions for each of those four counts.

Without the court or either party noticing this error, the case went to a jury trial that lasted four days. The government called 21 witnesses, including the seven women and girls de-scribed above. The defense did not call any witnesses, and Withers did not testify.

After the close of evidence, the court provided post-trial jury instructions on the law.[6] The instructions detailed each

---

[5] At the final pretrial conference, the court and counsel had the fol-lowing colloquy:

THE COURT: The next one is interesting, because the government wants the court to add recklessly disregard to [Counts] 1, 3, 4, and 9. It's not charged. It's not in the indictment; that's why I didn't include it….

[THE GOVERNMENT]: Well, then we don't have it included.

THE COURT: That's the court's view. But whether it should have been included and what the grand jury returned is irrelevant now because they didn't. And it's a lesser element than knowing, so we can't add it.

[THE GOVERNMENT]: Understood. That was my mistake.

THE COURT: … So that's not going to happen. [Defense counsel], are you tracking?

[DEFENSE COUNSEL]: Yes, I am.

(Final Pretrial Conf., March 16, 2017, ECF 206 at 26–27.)

[6] The court read the instructions aloud and projected them onto a screen for the jury to read along. Each juror was provided a copy of these same instructions to take to the jury room to consult during deliberations. The instructions—including definitions—that the court read to the jury were identical to the instructions projected on the screen and printed as copies.

count as charged in the superseding indictment. For Counts 1, 3, 4, and 9, the charged language did not include "recklessly disregarded," nor did the court recite that phrase in this part of its instruction. But when explaining the elements of each count, the court instructed the jury that the government had the burden to prove "[t]he defendant either knew or recklessly disregarded the fact that force, or threats of force, or coercion or any combination of these would be used to cause [the victims] to engage in a commercial sex act." (Jury Trial Trans., Afternoon Day 4, ECF 163 at 19, 21.) The court then read the definition of "recklessly disregards" as it appears in this court's pattern jury instructions:

> [A] person recklessly disregards a fact when he is aware of, but consciously or carelessly ignores, facts and circumstances that would reveal the fact that force, or threats of force, … or coercion would be used to cause another to engage in a commercial sex act.

(*Id.* at 29.)

During the government's closing argument, the prosecutor repeated the criminal elements appearing in the court's post-trial jury instructions, including the "recklessly disregarded" *mens rea* element for Counts 1, 3, 4, and 9. The prosecutor made no further mention of it in her closing or rebuttal. Withers' attorney did not object to the inclusion of "recklessly disregarded" in the court's instructions for Counts 1, 3, 4, and 9, or the definition of that phrase given by the court. In his closing argument, defense counsel did not reference the "recklessly disregarded" element at all. After deliberations, the jury returned a verdict finding Withers guilty on all nine counts. The court sentenced Withers to 18 years in prison.

Withers appeals his convictions for Counts 1, 3, 4, and 9 relating to Campbell, Young, and Sardeson. For the first time on appeal, Withers points out the error in allowing the jury to consider the "recklessly disregarded" *mens rea* element. Withers argues the district court constructively amended the superseding indictment when it included the "recklessly disregarded" element in its written and oral instructions to the jury for the four counts, and again when it defined the phrase "recklessly disregards" for the jury aloud and in writing.

Withers claims the prosecutor compounded the court's errors when she repeated the "recklessly disregarded" standard in her closing argument. To Withers, the prejudicial effect of these errors seriously affected the fairness, integrity, and public reputation of his case. Absent these errors, Withers claims it was reasonably probable the jury would have found him not guilty on those four counts.

The government responds that any error in including or defining the phrase "recklessly disregarded" in the jury instructions did not affect the outcome of the trial. According to the government, the overwhelming evidence at trial showed Withers had actual knowledge that force, threats of force, and coercion would be used to cause the women to engage in commercial sex acts.

## II. Discussion

### A.  Standard of Review

As described above neither the district court nor the parties noticed the erroneous inclusion of the phrase "recklessly disregarded" in the oral and written jury instructions. Because the error was not raised in the district court, we must decide whether Withers has affirmatively waived or merely

forfeited his challenge. *See United States v. Flores*, 929 F.3d 443, 450 (7th Cir. 2019) (clarifying that "waiver is a threshold consideration when reviewing for plain error") (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)).[7]

"Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court." *Flores*, 929 F.3d at 447; *see also United States v. Heon Seok Lee*, 937 F.3d 797, 818 (7th Cir. 2019) ("Waiver requires the intentional relinquishment of a known right, while forfeiture is a mere accidental or neglectful failure to assert a right."). This distinction carries significant consequences. "[W]aiver precludes appellate review altogether, while forfeited rights may be vindicated on appeal through plain-error review." *Heon Seok Lee*, 937 F.3d at 818; *see also Flores*, 929 F.3d at 447 ("We review forfeited arguments for plain error, whereas waiver extinguishes error and precludes appellate review.").

The "first step" in determining if plain-error review applies "is to ask whether the defendant intentionally relinquished the challenge [he] now presents." *Flores*, 929 F.3d at 445; *see also Heon Seok Lee*, 937 F.3d at 819 (defendant's "repeated decisions" not to pursue an argument during district court proceedings despite multiple opportunities "evinced a tactical choice"); *United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018) (we assess whether the defendant "chose, as a matter of strategy, not to present the argument" at trial). While criminal defendants especially "must make informed

---

[7] Before this court decided *Flores*, the panel invoked Circuit Rule 40(e) and circulated the opinion to all judges in active service, and no judge voted to hear the case en banc. *See* 929 F.3d at 450 n.1.

and intentional decisions when waiving their rights," *Flores*, 929 F.3d at 447, there is no "rigid rule" in assessing whether a defendant has waived a challenge to jury instructions. *Id*. at 148. Evidence that the defendant made a "knowing and intentional" choice not to challenge the issue at trial provides sufficient ground to find waiver "because it reflects an intentional decision on the defendant's part." *Id.* When that is the case, the defendant is precluded from pursuing the challenge on appeal. *See, e.g., Heon Seok Lee*, 937 F.3d at 819.

Nothing in the record shows that Withers or his counsel strategically decided not to object to the incorrect jury instructions. Both parties agree the phrase "recklessly disregarded" should not have been included in the instructions, and both acknowledge their own failure to notice that the phrase had been included. While opportunities existed before and during trial for Withers to notice and object to the error, nothing points to Withers or his attorney tactically choosing not to object or to otherwise "squirrel away objections" for appeal. *United States v. Kuipers*, 49 F.3d 1254, 1258 (7th Cir. 1995); *cf. Heon Seok Lee*, 937 F.3d at 819 (defendant waived argument by "strategically choosing to forgo his challenge"). Instead, as the parties admit, no one was aware of the error. The parties describe their collective failure to recognize the error as a "mistake." As the prosecutor explained to this court at oral argument, if she knew the instructions were flawed, she would have raised the issue in the district court. Because Withers did not strategically forgo his challenge to the jury instructions, he forfeited, rather than waived, those objections. So we review for plain error.

Federal Rule of Criminal Procedure 52(b) provides that "[a] plain error that affects substantial rights may be

considered even though it was not brought to the [district] court's attention." *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018). This rule "is permissive, not mandatory." *Olano*, 507 U.S. at 735. Three conditions must exist before an appellate court may exercise its discretion to correct the error: (1) "there must be an error that has not been intentionally relinquished or abandoned"; (2) "the error must be plain—that is to say, clear or obvious"; and (3) "the error must have affected the defendant's substantial rights." *Rosales-Mireles*, 138 S. Ct. at 1904 (summarizing *Olano*). To satisfy the third condition, the defendant bears the burden of "show[ing] a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* at 1904–05 (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)). If these three conditions have been met, the appellate court should exercise its discretion to correct the forfeited error only "if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1905 (describing "*Olano*'s fourth prong").

We have applied this standard of review to erroneous jury instructions. *See United States v. Freed*, 921 F.3d 716, 720 (7th Cir. 2019) (repeating *Olano* considerations as four factors defendant must establish to pursue plain-error review and applying them to pattern jury instruction). These factors create a "high bar" for the defendant to meet. *Freed*, 921 F.3d at 720. As we have noted, "[a] plain error is not just one that is conspicuous but one whose correction is necessary to prevent a miscarriage of justice." *United States v. Groce*, 891 F.3d 260, 269 (7th Cir. 2018) (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). "[T]he plain error must have affected the defendant's substantial rights such that there is a reasonable probability that but for the error the outcome of the trial

would have been different." *United States v. Carson*, 870 F.3d 584, 602 (7th Cir. 2017). So Withers must show the erroneous jury instructions affected his substantial rights and prejudiced his trial such that the jury probably would have acquitted him if the instructions had not contained the "recklessly disregarded" standard. *See United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005) (affirming conviction because defendant could not show he probably would have been acquitted if the jury instruction had been accurate).

**B.  Jury Instructions**

Withers argues the superseding indictment was constructively amended when the jury was erroneously instructed as to the state of mind requirement on the challenged four counts. "Constructive amendment occurs where the trial evidence supports (or the court's jury instructions charge) an offense not alleged in the indictment." *Heon Seok Lee*, 937 F.3d at 806 (citing *United States v. Burge*, 711 F.3d 803, 813 (7th Cir. 2013)). This complaint originated from the rule that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Id.* (citing *Stirone v. United States*, 361 U.S. 212, 217 (1960)). For an indictment to be constructively amended, the jury must receive a "complex of facts distinctly different from those set forth in the charging instrument," permitting a different crime to be proved at trial. *United States v. Galiffa*, 734 F.2d 306, 314 (7th Cir. 1984).

"Two states of mind support sex trafficking: knowledge or reckless disregard." *Groce*, 891 F.3d at 268. Title 18 U.S.C. § 1591(a) authorizes only those two *mens rea* elements. Neither party here disputes that the jury instructions were plainly wrong as to the state-of-mind requirement on the four challenged counts. It was error for the jury to be able to consider

the trial evidence at the lesser, presumably easier to satisfy standard of "recklessly disregarded."

Despite this error, the evidence at Withers' trial did not prove a new or different crime. The trial record did not support an offense not alleged in the superseding indictment, so no constructive amendment occurred. The evidence the jury heard on Withers' state of mind was the same regardless of the *mens rea* element, and it demonstrated overwhelmingly that Withers knew—not just merely recklessly disregarded— that his conduct caused the women to engage in prostitution. As detailed above, each of the women charged in the four challenged counts of the superseding indictment testified that Withers:

- posted Backpage ads for them to perform commercial sex acts and arranged "dates" for them online and over the phone;

- instructed them to "upsell" additional sex acts for more money;

- transported them within and across various states knowing they would be performing commercial sex acts or prostitution;

- physically and emotionally abused them and threatened their physical safety; and

- controlled their phones and food and made them financially dependent on him by taking 100% of the proceeds from the dates.

The jury also heard from two additional witnesses, Dillman and Mast, whose testimonies showed the extent of Withers' knowledge at the time he committed these crimes.

All this evidence established that Withers engaged in intentional and repeated physical and sexual abuse, threats, and control of food, travel, and contact with others to force and coerce the women to engage in commercial sex acts. The record contains an enormous amount of proof of Withers' actual knowledge.

We conclude the same for the prosecutor's closing argument during which she merely repeated the court's jury instructions. She neither provided the jury members with new information to support a different claim nor elaborated on the "recklessly disregarded" standard to prove a lesser charge.

Withers argues that some evidence, especially elicited on cross-examination about his relationships with some of the women and girls, is consistent with the lowered *mens rea* standard of "recklessly disregarded." But the trial evidence revealed no scenario in which the jury found Withers recklessly disregarded but did not know that he was using force, threats, or coercion to cause these women to engage in commercial sex acts. The only story told was of an intentional series of controlling and threatening acts, forcing these women to prostitute themselves for his monetary gain, within Wisconsin and in other states. *See Groce*, 901 F.3d at 269–70. A case has not been made that but for the "recklessly disregarded" *mens rea* element Withers would have been acquitted on these four counts. While the jury instructions were erroneous, Withers has not shown that they, or the prosecutor's repetition of them, affected his substantial rights and the fairness, integrity, or public reputation of his trial. *See Rosales-Mireles*, 138 S. Ct. at 1906 (quoting *Olano*, 507 U.S. at 735).

Twice recently this court has faced similar challenges in sex trafficking cases. In *United States v. Groce*, the defendant

argued the district court plainly erred by instructing the jury it could find he acted with reckless disregard if he "carelessly ignored the relevant facts and circumstances." *Groce*, 891 F.3d at 268. The defendant argued "this lowered the *mens rea* from criminal recklessness (which requires actual awareness of a substantial risk and conscious disregard of it) to mere negligence." *Id.* According to the defendant, this error allowed the jury to convict him of sex trafficking without requiring proof of all elements. *Id.* at 269.

Like here, in *Groce* we recognized that the instruction was inaccurate, but that the error did not affect the defendant's substantial rights. In *Groce*, the defendant could not show a reasonable probability that but for this error the outcome of his trial would have been different "because overwhelming evidence[8] demonstrated he did not merely *recklessly disregard* but he *knew* force, threats of force, and coercion were used to cause the victims to engage in commercial sex acts." *Id.* The defendant there, like Withers, was the one inflicting the abuse that forced his victims to prostitute. *Id.* at 270. Based on that strong evidence in *Groce* we held there was no reasonable probability the erroneous jury instruction impacted the jury's deliberations or otherwise changed the outcome of the case. *Id.*

Just so, in *United States v. Carson* the defendant argued erroneous jury instructions allowed the jury to convict him on sex trafficking charges under a lesser *mens rea* standard. *Carson*, 870 F.3d at 601–02. There, the instructions contained a

---

[8] The record revealed the defendant's "deliberate pattern of physical abuse, threats, and heroin control" that "caused the victims to prostitute." *Id.* at 269.

definition of "reckless disregard" that stated the defendant had to be aware of "but consciously *or* carelessly ignore[]" that force, threats of force, or coercion would be used to cause the victim to engage in a commercial sex act (emphasis added). *Id.* at 601. The defendant argued, and the government conceded, that the instruction should have stated he "consciously *and* carelessly ignore[d]" that force, threats of force, or coercion had occurred (emphasis added). *Id.* Despite the inaccurate definition of "reckless disregard," this court in *Carson* examined the record and concluded there was overwhelming evidence[9] showing the defendant's state of mind so the erroneous instructions did not prejudice his substantial rights. *Id.* at 602–03.

Withers' response—that the evidence in *Groce* and *Carson* was more incriminating than here—is unpersuasive. This case concerned more victims, more frequent dates, and trafficking farther from the women's homes. The jury instructions here incorrectly included language absent from the superseding indictment. But similar to *Groce* and *Carson,* this jury was presented with overwhelming evidence of Withers' knowledge and more than sufficient facts to convict Withers of the offenses charged in the four challenged counts. *See Groce*, 891 F.3d at 269; *Carson*, 870 F.3d at 601. That same prodigious

---

[9] The evidence showed the defendant raped, beat, threatened, and isolated his victims by taking their cell phones and clothing away. *Carson*, 870 F.3d at 602. This conduct was in contrast to someone playing a "minor role" in a sex trafficking scheme—"for example, one who acted as a driver but who stuck his head in the sand about what happened to the women after he dropped them off at a designated address." *Id.* As we noted, "it is hard to imagine how [this defendant] could carelessly disregard the circumstances of the force or coercion when he was the actor forcing and coercing." *Id.*

proof rebuts Withers' claim that the cumulative effect of the errors at trial denied him a fair trial. *See Groce*, 891 F.3d at 271.

### III. Conclusion

The defendant was not indicted as having "recklessly disregarded" that force, threats of force, or coercion would be used to cause his victims to engage in commercial sex acts, so the jury instructions for Counts 1, 3, 4, and 9 should not have included that phrase. But given the overwhelming evidence at trial of Withers' knowledge on this *mens rea* element, the erroneous jury instructions did not impact Withers' substantial rights or otherwise prejudice his trial, so we AFFIRM.

EASTERBROOK, *Circuit Judge*, concurring. The parties' appellate briefs debate the question whether the jury instructions on four counts constructively amended the indictment—and, if they did, whether that was plain error. The court's opinion, which I join, resolves that debate as the parties have framed it. See *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) (enforcing the principle of party presentation). But I question whether "constructive amendment" is a useful doctrine, and I hope that our court will find an appropriate occasion to revisit the subject.

I do not see how jury instructions can amend an indictment, constructively or otherwise. The indictment is what it is. It *cannot* be amended by a jury instruction. If a jury instruction permits conviction on a charge other than the one framed by the indictment, that is an error, see *Stirone v. United States*, 361 U.S. 212 (1960), but not because the indictment has been amended. It is an error because, when the proof does not conform to the charge, the defendant must be acquitted. Immaterial variance is harmless, but material variance is forbidden.

Discussing this simple rule in terms of "constructive amendment" diverts attention from what matters. A "constructive amendment" argument proceeds in multiple steps: first, the proof or jury instruction is said to amend the indictment; second, the defendant observes that only a grand jury can amend an indictment lawfully; third, the defendant contends that this forbidden judicial amendment spoils the conviction. Why insert a legal fiction (the nonexistent amendment) into a simple argument? Use Occam's Razor and cut out the unnecessary steps.

Our litigants did not invent the constructive-amendment approach. They picked it up from judicial opinions. It has been elaborated into a multi-factor analysis that seems subtly different from a search for variance. See, e.g., *United States v. Heon Seok Lee*, 937 F.3d 797, 806–08 (7th Cir. 2019). Why?

Until recently the doctrine was unheard-of. It stems from *Stirone*, but indirectly. The Justices stated: "The crucial question here is whether [Stirone] was convicted of an offense not charged in the indictment." 361 U.S. at 213. The indictment charged interference with interstate commerce by extortion. A producer in Pennsylvania had a contract to supply concrete for use in building a steel mill (also in Pennsylvania). The indictment alleged that Stirone used his position as a union's leader to demand concessions from management by threatening strikes, which would interfere with interstate shipments of sand needed for the concrete. Come the trial, however, the prosecution presented evidence of the mill's potential effect on interstate commerce in steel. The Court wrote:

> Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. … [W]e cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet because of the court's admission of evidence and under its charge this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him. This was fatal error.

*Id*. at 217, 219.

Nine years later, the D.C. Circuit described *Stirone* as finding a "variance substantial enough to amount to a con-

structive amendment of the indictment". *Gaither v. United States*, 413 F.2d 1061, 1072 (D.C. Cir. 1969). From this analogy a judicial rumor chain began. The Third Circuit picked up the language of "constructive amendment" in 1971. *United States v. De Cavalcante*, 440 F.2d 1264, 1271 (3d Cir. 1971). It reached this court in 1983. See *United States v. Cina*, 699 F.2d 853 (7th Cir. 1983). None of these decisions, or any other I have seen, asked what sense it makes to analyze a variance in terms of "constructive amendment." Some decisions attribute the "constructive amendment" business to *Stirone*, but that phrase does not appear there—or in any other decision of the Supreme Court in criminal litigation.

Today every court of appeals (including the Federal Circuit) has used the "constructive amendment" language, which has appeared in at least 1,900 appellate opinions. None of these decisions explains why this is an improvement on the rule that the proof must conform to the indictment. None appears to have noticed that the phrase "constructive amendment" has never been used by a single Justice in a criminal case. It does nothing but complicate what ought to be a simple question of variance.